**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-CV-00153-EWN-MJW


DAVID HABECKER and THE FREEDOM FROM RELIGION FOUNDATION, INC.,

      Plaintiffs,

v.

TOWN OF ESTES PARK, COLORADO;
BOARD OF TRUSTEES OF THE TOWN OF ESTES PARK, COLORADO;
LORI JEFFREY-CLARK, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
SUE DOYLEN, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
CHUCK LEVINE, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
WAYNE NEWSOM, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
BILL PINKHAM, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
JOHN BAUDEK, MAYOR OF THE TOWN OF ESTES PARK, COLORADO;
VICKIE O'CONNOR, TOWN CLERK OF THE TOWN OF ESTES PARK, COLORADO;
GREG WHITE, TOWN ATTORNEY FOR THE TOWN OF ESTES PARK, COLORADO;
ESTES PARK CITIZENS FOR REPRESENTATIVE GOVERNMENT;
DEWEY SHANKS, MEMBER, ESTES PARK CITIZENS FOR REPRESENTATIVE GOVERNMENT;
NORMAN D. PRITCHARD, MEMBER, ESTES PARK CITIZENS FOR REPRESENTATIVE GOVERNMENT; and
RICHARD H. CLARK, MEMBER, ESTES PARK CITIZENS FOR REPRESENTATIVE GOVERNMENT,

      Defendants.

---

**PLAINTIFFS' OPENING BRIEF**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

COME NOW the Plaintiffs and file this Opening Brief in Support of their Motion for

Summary Judgment:

**TABLE OF CONTENTS**

*Page*

I.   Introductory Statement..........................................................................................1

II.  Facts.....................................................................................................................2

III. History of the Pledge of Allegiance....................................................................5

IV.  Argument..............................................................................................................6

    A.   The Pledge of Allegiance Violated Plaintiff Habecker's
        First Amendment Rights...........................................................................6

    B.   The Forced Recitation of the Pledge of Allegiance Constituted
        a Religious Test for Public Office in Violation of Article Six of the
        United States Constitution........................................................................14

    C.   The Court Is Empowered to Grant Relief Under Both
        the Declaratory Judgments Act and the Civil Rights Act........................16

V.   Conclusion...........................................................................................................18

**TABLE OF CITED AUTHORITIES**

**Cases:**

*Bennett v. Spear,* 520 U.S. 154 (1997)...........................................................................16

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991).......................................12, 17

*Epperson v. Arkansas,* 393 U.S. 97 (1968).......................................................................6

*Everson v. Board of Ed. of Ewing,* 330 U.S. 1 (1947)......................................................6

*Lee v. Weisman,* 505 U.S. 577 (1992)..........................................................................7, 19

*Lemon v. Kurtzman,* 403 U.S. 602 (1971)......................................................................11

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)....................................................16

*Mapp v. Ohio,* 367 U.S. 643 (1961)...............................................................................15

*Mark v. Borough of Hatboro,*
    51 F.3d 1137 (3rd Cir. 1995), *cert. denied* 516 U.S. 858 (1995)..........................17

*Marsh v. Chambers,* 463 U.S. 783  (1983).......................................................................8

*McCreary County, Kentucky v. ACLU,* ____U.S.___, 125 S.Ct. 2722 (2005)............11, 12

*Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974)......................................8

*Palko v. Connecticut,* 302 U.S. 319 (1937).....................................................................14

*Riley v. National Federation of Blind of N.C., Inc.,* 487 U.S. 781 (1988).......................8

i

*Romer v. Evans*, 517 U.S. 620 (1996)......................................................................11, 12
*Santa Fe Independent School Dist. v. Doe,* 530 U.S. 290 (2000)............................8, 19
*School Dist. of Abington Township v. Schempp,* 374 U.S. 203 (1963)...........................13
*Silverman v. Campbell,* 486 S.E.2d 1 (S.Ct. S.Caro. 1997)..........................................15
*Terry v. Adams,* 345 U.S. 461 (1953)......................................................................17, 18
*Torcaso v. Watkins,* 367 U.S. 488 (1961)........................................................................15
*Valley Forge Christian College v. Americans United for Separation*
    *of Church and State,* 454 U.S. 464 (1982)..........................................................16
*Van Orden v. Perry*, ____U.S.____, 125 S.Ct. 2854 (2005)......................................11, 12
*Wallace v. Jaffree,* 472 U.S. 38 (1985).............................................................................6
*West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624 (1943)........................................9, 10
*Wolf v. Colorado,* 338 U.S. 25 (1949).........................................................................14, 15
*Wooley v. Maynard,* 430 U.S. 705 (1977).........................................................................8
*Zorach v. Clauson,* 343 U.S. 306 (1952)..........................................................................13

**Statutes and Constitutional Provisions:**

United States Constitution:
    Amendment One.......................................................9, 10, 11, 13, 15, 16, 18
    Amendment Fourteen.......................................................................14, 15
    Article Six.........................................................................10, 14, 15, 16
4 U.S.C. §4 (1954)................................................................................................6
28 U.S.C. § 2201.................................................................................................16
28 U.S.C. § 2202.................................................................................................16
36 U.S.C. §302....................................................................................................6
42 U.S.C. §1983.............................................................................................16, 17
Colorado Constitution:
    Article II, Section 4......................................................................................16
C.R.S. §31-4-501, *et seq*................................................................................13, 17
C.R.S. §31-4-502(1)(a)(I).................................................................................13, 18

**Other Authorities:**

101 Cong. Rec. 4384 (1955).................................................................................6
Guenter, S., *The American Flag, 1777-1924* (1990)..............................................5
*H.R.J. Res. 243 and Other Bills on Pledge of Allegiance:*
    *Hearing Before Subcomm. No. 5 of the House Comm. on the Judiciary,*
    83d. Cong. 37 (1954) (statement of Rep. Peter Rodino)......................................5
Kaufman, C., *Faith and Fraternalism:*
    *The History of the Knights of Columbus, 1882-1982* (1982)..............................5
Pub. L. No. 623, Ch. 435, Sec. 7, 56 Stat. 380 (1942)...........................................5

ii

# I.  INTRODUCTORY STATEMENT

The record in this case shows that David Habecker was recalled from public office for one reason only — because he refused to recite the Pledge of Allegiance.   The September 28, 2004 meeting of the Estes Park Board of Trustees at which the issue of a recall first came up, the Statement of Grounds in the recall petition, and all the discovery in this case lead to this inescapable conclusion.   There was no allegation of incompetence, ineffectiveness, or any reason given for the recall other than Habecker's declining to say the Pledge.

The record also shows that Habecker declined to recite the Pledge because it contradicts his religious convictions.  Habecker does not believe in God and, therefore, could not state an oath that this is a nation *under God*.  "Under God" in the Pledge of Allegiance is an endorsement of religion by government in violation of the Establishment Clause.  Subjecting Habecker to recall for refusing to recite the Pledge was a denial of his constitutional right to religious freedom which the Supreme Court has repeatedly said includes freedom *from* religion.  It also imposed upon Habecker the requirement to subscribe to a loyalty oath to God in derogation of the Constitutional provision which prohibits a religious test for public office.

If the Court does not step in and redress this injustice, it is very likely to be the first of many recalls based on religious grounds.  The door will be opened to a purge of public officials who do not believe in a divinity or that this is a nation subservient to a divinity.   It will harken back to the days when Negroes were denied the right to hold public office except that, now, it will be court-sanctioned segregation on account of religion rather than race.  This bigotry must be stopped before it gains a foothold.

1

## II.  FACTS

The following facts are set forth in the Scheduling Order entered on May 10, 2005, and are, therefore, not in dispute.  On the basis of these facts and the deposition of Plaintiff Habecker, cited below, this case is ripe for summary judgment.

In 1984, Plaintiff was first elected to a four-year term to the office of Town Trustee of the Town of Estes Park.  He was re-elected to another four-year term in 1988.  In 2000, he was elected to fill the vacancy of a deceased Trustee, and he was elected to another four-year term in 2002.  Prior to the recall election, his term would have expired in April, 2006.

There are six Town Trustees, plus the Mayor, which form the Board of Trustees.  The Mayor is an *ex officio* member of the Board and is allowed to vote only in the case of ties.  The Board of Trustees establishes budgets, appropriates funds, has the authority to hire and fire the Town Manager and the Town Attorney, and sets policy for the Town.

The Board conducts formal meetings twice a month, and it is the duty of each Trustee to attend meetings.  Meetings are open to the public.  At the May 11, 2004 meeting, the Mayor announced a new policy of formally opening meetings with the Pledge of Allegiance.  Plaintiff stood and pretended to say the Pledge on May 11 and several subsequent meetings.  However, he felt like a hypocrite and, at the September 14, 2004 Board meeting, Plaintiff remained seated and refrained from saying the Pledge.  (Habecker deposition, pp. 17, 74).

Lori Jeffrey-Clark is a Town Trustee.  At the Board meeting on September 28, 2004, she put

enlarged copies of currency before each Trustee's place on the bench.[1]  A group of Webelo Scouts attended that meeting.  Ms. Jeffrey-Clark noted her dismay in Habecker's position concerning not participating in reciting the Pledge of Allegiance.

Defendants Shanks, Pritchard, and Clark[2] formed a committee to recall Plaintiff.  The statement of grounds in their recall petition stated as follows:

"Electors suffer loss of confidence in Mr. Habecker's ability to represent citizen's pride, patriotism, and common decency.  Prior to Town Board of Trustees meetings, he purposefully and irreverently chooses to publicly sit, facing away from the flag of the United States, during recital of the Pledge of Allegiance.  His defiant behavior occurs because the phrase '...under God...' offends him.  He states he intends to continue until the United States Congress strikes the phrase from the Pledge of Allegiance.

Habecker failed to reveal this violation of his principles during campaigns for election.  We consider this omission a deliberate tactic to assure voter ballots towards his election.  We consider this tactic unethical and unacceptable.

We respect Mr. Habecker's right to free speech under the Constitution of the United States, but insist on maintenance of responsibility, accountability, leadership, respect for others, and high standards of public conduct.  His vital beliefs regarding church/state personal conflicts were not revealed at the critical time of election.  We do not regard these actions, omissions or motivations honorable, and demand his removal from his elected position."

Defendant Town Clerk Vickie O'Connor certified the Recall Petition as sufficient.  The Petition was submitted to the Board of Trustees at its December 14, 2004, meeting, and the Board set February 15, 2005, as the date for the recall election.

---

[1]  The Court can take judicial notice that U.S. currency contains the national motto "In God We Trust."  Habecker recalls one Board member suggesting that this was the reason for placement of the currency.  (Habecker deposition, p. 20).

[2]  Hereinafter, the "Non-Town Defendants."

3

On February 10, 2005, the Court issued a preliminary injunction which prevented the election from being held on February 15.

On March 2, 2005, the preliminary injunction was dissolved by the Court.

At the March 8, 2005 meeting of the Board, Town Attorney Greg White advised the Board that it could hold the recall election on either March 22 or March 29, even though those dates were more than 90 days after the submission of the recall petition to the Board. The Board voted to hold the recall election on March 22, 2005. The vote of the Board on this issue was unanimous except for the negative vote of Plaintiff.

The recall election was held on March 22, 2005. As a result, Plaintiff Habecker lost his seat on the Board of Trustees. A total of 1,508 votes were cast, of which 903 voted in favor of the recall and 605 against.

The Mayor and the Board of Trustees have refused Plaintiff's request to discontinue recitation of the Pledge of Allegiance and the Pledge continues to be recited at the beginning of Board meetings.

Plaintiff Habecker was deposed on June 16, 2005. In the course of his testimony, he introduced all the e-mails both he and the Town's web site had received concerning his recall. Of one hundred sixty total e-mails, one hundred fifty three said they would vote for or against Habecker because of his stance on the Pledge, six were highly vindictive but did not mention the Pledge specifically, and one said it would vote against Habecker for a reason other than the Pledge. (Habecker deposition Exhibit 4).

4

### III.  HISTORY OF THE PLEDGE OF ALLEGIANCE

The Pledge of Allegiance was originally written in 1892 by an ordained Baptist minister, Francis Bellamy,  to celebrate the four hundredth year of Columbus' first voyage to the United States.  Bellamy's composition made no reference to religion.  It read:  "I pledge allegiance to my Flag and the Republic for which it stands: one Nation indivisible with Liberty and Justice for All." S. Guenter, *The American Flag, 1777-1924,* 130-31 (1990).

In the summer of 1892, President Benjamin Harrison issued a proclamation promoting display of the flag in schools and, in 1898, the individual states began passing laws requiring recitation of the Pledge in public schools, New York State being the first.  S. Guenter, *supra,* Ch. 6, "The Flag Ritual Comes to the Public Schools," 114-32.   In 1942, a national flag code, which included the Pledge of Allegiance, was enacted by the United States Congress.  Pub. L. No. 623, Ch. 435, Sec. 7, 56 Stat. 380 (1942).

Although several changes were made to the Pledge in the first sixty-plus years of its existence, it was not until 1954 that the concept of religion was introduced.  S. Guenter, *supra,* 175-78.  This was in the midst of the Cold War, the denouncement of "godless Communism," and the hysteria of the McCarthy era.  A campaign to insert "under God" in the Pledge was spearheaded by the Knights of Columbus, an extremely sectarian Roman Catholic fraternal group. C. Kaufman, *Faith and Fraternalism: The History of the Knights of Columbus, 1882-1982*, 385 (1982). Congressional sponsors of the amended Pledge clearly stated  their intention "...that every day our children go to school and make their pledge of allegiance to the flag, they recall that they do so with recognition of God." *H.R.J. Res. 243 and Other Bills on Pledge of Allegiance: Hearing Before*

5

*Subcomm. No. 5 of the House Comm. on the Judiciary,* 83d. Cong. 37 (1954) (statement of Rep. Peter Rodino).

The amended Pledge was codified into law and now states: "I pledge allegiance to the flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all." 4 U.S.C. §4 (1954). Two years later "In God We Trust" was made our national motto. 36 U.S.C. §302. Congressman Bennett of Florida, who introduced and managed that legislation in the House of Representatives, stated: "At the base of our freedom is our faith in God and the desire of Americans to live by His will" and "As long as this country trusts in God, it will prevail." 101 Cong. Rec. 4384 (1955).

## IV.  ARGUMENT

Plaintiffs seek two forms of relief: (1) a declaratory judgment and (2) a judgment that Plaintiff Habecker's civil rights have been violated. The Court is empowered to grant *both* forms of relief; it need not choose one or the other. For the most part, these two causes of action merge: the declaratory judgment being rendered on the basis of equitable principles and the civil rights claim being similar except that it adds the element of state action infringing on Plaintiff Habecker's Constitutional rights. The Constitutional issues involved are identical.

**A.  The Pledge of Allegiance Violated Plaintiff Habecker's First Amendment Rights**

It is axiomatic that the state has no right to force a citizen to pay homage to a deity. The Court has made it clear that citizens are entitled to worship any God or no God at all. *Wallace v. Jaffree*, 472 U.S. 38, 53 (1985); *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968); *Everson v. Board*

6

*of Ed. of Ewing*, 330 U.S. 1, 15-16 (1947).  This protection lies at the very heart of our republican form of government.

Plaintiff Habecker is an agnostic.  He does not believe in any God and he cannot, in conscience, profess that this is a nation *under* God.[3]  Yet, that is precisely what he would have had to do to avoid being recalled from office.

Habecker was in a circumstance where being confronted with the Pledge could not be considered voluntary in any fair sense of that word.  He was not a spectator at a baseball game or even on the campaign trail where he could have just as easily chosen to be absent rather than face the prospect of political disfavor.  Habecker was an elected member of a government Board whose meetings required his attendance.  The Pledge was recited after the Board meeting had been opened and it was, therefore, an integral part of the Board's official business.  Habecker was trapped.  It would be sophistry to argue that Habecker had every right to abstain from saying the Pledge and, yet, that he must bear government-sanctioned consequences for his action.  If one can be removed from office for exercising such a basic right, the right is empty.

In *Lee v. Weisman*, 505 U.S. 577 (1992), the government argued that, because attendance at a public high school graduation was voluntary, the Plaintiff, a graduating student, could have avoided a religious benediction to which the student objected merely by not attending the commencement ceremony.  The Court held that "(such an) argument lacks all persuasion.  Law

---

[3] By proclaiming that this is *one, indivisible* nation under God, the Pledge forecloses any accommodation whatsoever to nonbelievers.  If the tables were turned, and the Pledge specifically excluded the possibility of a divinity, the Court would surely view this as hostile to religion.  *See* cases cited *infra* at page 13.

reaches past formalism.  And to say a teenager has a real choice not to attend her high school graduation is formalistic in the extreme." *Id.* at 595.  Similar logic was applied to enjoin a student-led prayer at an interscholastic football game.  Rejecting the argument that the student could have opted to avoid the prayer simply by not attending the game, the Court held that student participation at sporting events is part of the school experience and it would be unreasonable to force a student to make such a choice.  *Santa Fe Independent School Dist. v. Doe,* 530 U.S. 290 (2000).

The situation faced by Habecker was far worse than merely attending a public function like a commencement or a football game.  Habecker was *required* to attend and was expected to *actively participate* in the ceremony, i.e., he was supposed to rise, put his hand over his heart, and join in reciting the Pledge.  That also differentiates this case from others such as *Marsh v. Chambers,* 463 U.S. 783  (1983), where legislative prayer was held to be constitutional.   In *Marsh,* the legislators in attendance merely sat passively, albeit solemnly, while a clergyman prayed.  Had those legislators been asked to kneel and join in the prayer, the result in *Marsh* would surely have been different.[4]

By exercising his constitutional right not to participate in saying the Pledge, Plaintiff Habecker thereby revealed his innermost religious beliefs.  Neither the Mayor nor the Board of Trustees had the right to put him in that position.  Citizens are entitled to remain silent and to hold their religious beliefs private.  *Wooley v. Maynard,* 430 U.S. 705 (1977); *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781 (1988); *Miami Herald Publishing Co. v. Tornillo*,

---

[4] Justice Brennan dissented in *Marsh* even though, referring to a previous opinion,  he noted that legislators could absent themselves "*...without incurring any penalty, direct or indirect*." *Marsh v. Chambers* at 796, footnote 2.  (Emphasis supplied).  Obviously, that was not the case here.

418 U.S. 241, 246 (1974); and *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943).  The Pledge had the effect of allowing "Peeping Toms" like the Non-Town Defendants to ferret out nonbelievers and then retaliate against them.[5]

There is yet another aspect of the Pledge, with its reference to God, that is cause for concern. It combines patriotism with religion, a volatile mixture to say the least.  It encourages religious bigots to pursue their agenda against nonbelievers under the pretext that the latter are "un-American" or else they would say the Pledge.

In *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624 (1943), the Court addressed the constitutionality of a State law that imposed penalties for any student who refused to join in reciting the Pledge of Allegiance.  At the time, the Pledge made no reference to God.  Nevertheless, the Court held that the law abridged the constitutional rights of a Jehovah's Witness whose religion considered the Pledge to be a form of idolatry.  *Barnette*, a bulwark in First Amendment law, continues to stand for the proposition that the Free Exercise Clause prohibits the State from forcing one to violate his or her religious convictions.

In a strongly worded opinion, Justice Jackson in *Barnette* stated that "The very purpose of the Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of the majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press,

---

[5]  It is not a coincidence that the record shows that Board member Lori Jeffrey-Clark, wife of one of the Non-Town Defendants, first asked the Mayor to begin Board meetings with the Pledge. (Habecker deposition, p. 11).

freedom of worship and assembly, and other fundamental rights *may not be submitted to vote; they depend on the outcome of no elections." Id.* at 638.  (Emphasis supplied).

Habecker lost his seat because, and only because, of the Pledge of Allegiance.  This is not open to question.  At his deposition, Habecker introduced all the e-mails both he and the Town had received on the issues pertinent to the recall.  As stated above, of one hundred sixty total e-mails, one hundred fifty three said they would vote for or against Habecker because of his stance on the Pledge, six were highly vindictive but did not mention the Pledge specifically, and only one said it would vote against Habecker for a reason other than the Pledge.  (Habecker deposition, Exhibit 4).

Were it not for the fact that the Pledge of Allegiance bears the national government's *imprimatur*, and that it combines religion with patriotism, Habecker would undoubtedly be continuing to serve out his term as a Town Trustee.

There appears to be no legal or practical way to reconstruct matters in a way that would make Habecker whole.  This Court vacated the preliminary injunction it had originally put in place, and by the time this case wends its way through the courts, Habecker's normal term will have expired.[6] The Court can, however,  take remedial steps to ensure that this tawdry episode is not repeated.  It can declare recitation of the Pledge of Allegiance unconstitutional not only as an infringement of Habecker's right to free exercise of religion but also as violations of the Establishment Clause and Article Six of the Constitution which prohibits religious tests for public office.  This would do no violence to Colorado law or to the constitutional right of voters to petition their government for

---

[6]  Had it not been for the recall, April, 2006 would have been the expiration date of Habecker's term.

redress under the First Amendment.[7]  If the Court neglects to order corrective action, religious bigots are sure to seize the opportunity to use the Pledge as a masquerade to purge "undesirables."

In two decisions released on June 27, 2005, the Supreme Court reached opposite conclusions about displays of the Ten Commandments on public property.  Justice Breyer, who cast the decisive vote in each case, reasoned that the most important decisional factor was the context in which the displays were *use*d.  In *McCreary County, Kentucky v. ACLU,* ____U.S.___, 125 S.Ct. 2722 (2005), He found that the display was used to advance religion and, therefore, joined the majority to declare it unconstitutional.  However, in *Van Orden v. Perry*, ____U.S.____, 125 S.Ct. 2854, 2868-2872 (2005), Justice Breyer concurred with the plurality by voting to uphold the constitutionality of the display on the basis that its use was to emphasize the historical significance of the Ten Commandments.  Justice Breyer explained that the latter decision was based, in part, on factors that he considered "critical" in closely-contested First Amendment cases, *i.e.,* that in the forty-year history of the monument, it had engendered no controversy and had not proven divisive.  *Id.* at 2871.

That has certainly not been the case regarding the Pledge of Allegiance in Estes Park, Colorado.

Justice Breyer abandoned the three prong test first articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), describing that test as unduly literal and formulaic and citing a litany of criticisms of the test by various Supreme Court Justices over the years.  *Van Orden v. Perry,* 125 S.Ct. 2868-

---

[7]  *See Romer v. Evans*, 517 U.S. 620 (1996), where the Court invalidated a constitutional amendment approved by Colorado voters which prevented state and local legislatures from enacting laws to prohibit discrimination against homosexuals.  This decision stands, *inter alia,* for the proposition that voters do not have free reign to repeal constitutional protections notwithstanding their right  to petition for redress of grievances under the First Amendment.

2869, 2871.  While the academic community will undoubtedly be arguing over the precise meaning of *Van Orden* and *McCreary County* for years to come and, tenuous as Justice Breyer seemed to be in stating his position, his reasoning now controls the adjudication of such cases.  Analysis will now be fact-intensive and will focus more on context and use.  Measured by those criteria here, the Pledge of Allegiance fails.

What was the purpose of adding "Under God" to the Pledge?  The legislative history leaves no doubt.  It was to ally God with this country against the threat of atheistic communism.  The religious community was heavily involved in promoting deism as part of our system of government.  The Pledge is certainly more than an *acknowledgment* of God — it is an *oath* to God enacted into law by government.  That is what the legislature intended, and that is how the Pledge is routinely *used*.

And how was the Pledge used in *this* case?   To unseat Habecker for his refusal to stand and recite it.  All one need do is examine the recall petition to see the *animus* directed at Habecker only because he exercised a fundamental right of religious freedom which this Court is obligated to protect.

It is not the voters whose rights are being challenged here, even though the voters had no right to repeal Habecker's basic constitutional protections.  *Romer v. Evans, supra,* footnote 7.  It is the disgraceful recall petition which, due to its unconstitutionality, should never have been certified by the Town Clerk and allowed to go to a vote in the first place.

In *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 (1991), the United States Supreme Court held that it would strike down the use of peremptory challenges to eliminate Negroes as jurors

12

in a civil lawsuit.   The Court did not dwell on the outcome of that lawsuit; rather, it declared unconstitutional the attempt by a private litigant to use an otherwise legitimate procedure for an improper end.  The same rationale applies here, i.e., the Colorado recall statute, C.R.S. §31-4-501, *et seq.*, a perfectly legitimate State law, cannot be used to subvert basic First Amendment rights.

The Court has repeatedly stated that the Establishment and Free Exercise Clauses do not require that government be hostile to or exhibit "callous indifference" to religion.  *School Dist. of Abington Township v. Schempp,* 374 U.S. 203,  225 (1963) and *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).  As a result, religion has been accommodated whenever possible.  It takes little imagination to conjecture what the Court would say if the Pledge contained a clause that said this is "*not* a nation under God."   The same lack of hostility that is extended to religion should also be applied to accommodate the agnostic and the nonbeliever.[8]

It would be an utter rationalization to contend that nothing can be done about the injustice done to this Plaintiff simply because the Colorado recall statute states that the grounds for a recall "...shall not be open to review."  C.R.S. §31-4-502(1)(a)(I).  Would anyone seriously argue that a person can be recalled only because he/she is black, or only because he/she is disabled, or only because he/she is not heterosexual?  Would any court countenance such overt discrimination?  Would any court be prepared to say that, while it is not proper to discriminate on the basis of color, race, or sexual preference, it is nevertheless proper to discriminate on the basis of religious belief?

---

[8]  The Town Defendants' avowal that they are "neutral" in this case is precisely the kind of "callous indifference" that this Court should reject.  When a citizen is pilloried for exercising his First Amendment rights, government officials have a duty to act in defense of the Constitution.

If the Court does not order remedial action here, we are well on our way to a theocracy where the rule of law will give way to the rule of God and where atheists, agnostics, and religious nonconformists will be outcasts.

**B.  The Forced Recitation of the Pledge of Allegiance Constituted a Religious Test For Public Office in Violation of Article Six of the United States Constitution**

Article Six of the United States Constitution provides that "...no religious test shall ever be required as a qualification to any office or trust under the United States."  The Pledge of Allegiance requires the recitation of an oath to God.  Under the circumstances here, this was unquestionably a religious test.  Plaintiff's failure to meet the test by declining to recite the Pledge was the reason, the sole reason, for his recall.

The only question requiring resolution by the Court on the applicability of Article Six to the case at bar is whether the Due Process Clause of the Fourteenth Amendment imposes Article Six on the States in the same manner as it does the Bill of Rights.

In *Wolf v. Colorado,* 338 U.S. 25, 26-27 (1949), Justice Frankfurter analyzed the issue in considerable detail.  He cited with approval Justice Cardozo's opinion in *Palko v. Connecticut,* 302 U.S. 319, 325 (1937), which rejected the suggestion that the Due Process Clause is limited to transferring only the Bill of Rights to the States.  The Cardozo Court, said Justice Frankfurter, saw "...a different but deeper and more pervasive conception of the Due Process Clause" and that "It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society." *Wolf v. Colorado,* 338 U.S. at 27.

14

*Wolf* was later overruled by *Mapp v. Ohio,* 367 U.S. 643 (1961), but not because the Court wished to limit the application of the Due Process Clause.  To the contrary, the Court significantly expanded the Clause's coverage by applying to the States the federal exclusionary rule for illegally obtained evidence, a step it had refused to take in *Wolf.*  This was a resounding affirmation of Justice Frankfurter's analysis of the Due Process Clause in *Wolf.*

In *Silverman v. Campbell,* 486 S.E.2d 1  (S.Ct. S. Caro. 1997), the South Carolina Supreme Court held that the State Constitution's requirement that notaries swear an oath to God "...violate[s] the First Amendment *and* Religious Test Clause of the United States Constitution." *Id.* at 2. (Emphasis supplied).  In discussing the application of Article Six to the State of South Carolina, the Court cited *Torcaso v. Watkins,* 367 U.S.  488 (1961).

The Court in *Torcaso* held that the State of Maryland could not exact a religious oath as a condition for becoming a notary public.  An argument was made that the oath was a religious test in violation of Article Six.  In declining to rule on this contention the Court stated:  "Because we are reversing the judgment on other grounds, we find it unnecessary to consider appellant's contention that this provision applies to state as well as federal offices." *Id.* at 495.

Nevertheless, the Court clearly signaled what the result would have been if it had applied Article Six in that case by noting that the Constitution was designed specifically to prohibit religious tests and oaths because they are "abhorrent to our tradition." *Torcaso,* 367 U.S. at 491.  The Court explained that the Bill of Rights carried this principle further by outlawing religious establishments and guaranteeing religious freedom for ordinary citizens, not just public office-holders.  It saw a very

15

close connection between the First Amendment and Article Six which serves to support the proposition that the Due Process Clause imposes both provisions on the individual states.[9]

Plaintiff Habecker took an oath when sworn into office to uphold the United States Constitution, the Colorado Constitution, and the Ordinances of the Town of Estes Park. He should not have been expected, much less compelled, to voice any further oaths, particularly an oath to a divinity, as a condition of retaining public office.

**C. The Court is Empowered to Grant Relief under Both the Declaratory Judgments Act and the Civil Rights Act**

As stated earlier, Plaintiffs seek two distinct types of relief: (1) a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and (2) a judgment under 42 U.S.C. §1983 for violations of Habecker's civil rights. Each of these causes of action stands on its own, one being independent of the other.

To grant a declaratory judgment, the Court must find a constitutional transgression that has caused injury to the Plaintiff, that the injury is "fairly traceable" to the actions of the defendant(s), and that the injury is likely to be redressed by a decision favorable to the plaintiff. *Bennett v. Spear,* 520 U.S. 154, 162 (1997), citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992) and *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471-472 (1982). This case satisfies each criterion. Habecker has been deprived of political

---

[9]   The recall also violated Article II, Section 4 of the Colorado Constitution by denying Habecker political rights and privileges to which he was entitled and by discriminating against Habecker because of his opinions concerning religion.

office because, and only because, of a government-prescribed oath foisted on him by the Defendants which he, in conscience, could not recite.

This is also a civil rights case because the recall election was "state action" and the Defendants, including the Non-Town Defendants, were "state actors" within the meaning of 42 U.S.C. §1983.  In determining the application of 42 U.S.C. §1983 to the Non-Town Defendants, a two-step analysis is required.  First, the Court should ask "...whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority." *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1144 (3rd Cir. 1995), *cert. denied* 516 U.S. 858 (1995), interpreting *Edmonson v. Leesville Concrete Co., supra.*  Second, it must be determined whether the actions of the Non-Town Defendants were, in reality, state actions.  *Edmonson,* 500 U.S. at 620.

The conduct of elections for public office is a traditional government function which has its source in state authority.  Indeed, the recall election at issue was governed throughout the process by Colorado state law which sets forth in great detail the steps necessary to conduct a recall.  C.R.S. §31-4-501, *et seq*.  This was clearly "state action".

In *Edmonson v. Leesville Concrete Co., supra*, the Court held that a litigant who used peremptory challenges in a civil lawsuit to disqualify Negroes from sitting on a jury would be subject to 42 U.S.C. §1983.  The Court relied heavily on the fact that even though peremptory challenges, like recall petitions, are rights given to persons pursuant to state law, their abuse in depriving other citizens of their constitutional rights, will not escape attention by the Court.

In *Terry v. Adams,* 345 U.S. 461 (1953), the Court ruled that a private association which selected candidates to run in primaries was a "state actor" and was subject to suit under 42 U.S.C.

17

§1983 even though the candidates selected to run were not certified by the association nor did the primary ballot show that the association was involved in the selection process. This decision stands for the proposition that the mechanisms by which candidates or issues reach the ballot are subject to judicial scrutiny notwithstanding the First Amendment right of citizens to petition their government.

Here, the Non-Town Defendants were designated as a recall "committee" pursuant to C.R.S. §31-4-502(1)(a)(I). They were the sole authors of the recall ballot and were identified as such. Their only purpose was to recall Plaintiff as a Town Trustee for refusing to recite the Pledge of Allegiance. They were intimately involved in the election process — far more than the association in *Terry v. Adams*. It was *their* election and they used all the machinery of the State at their disposal to unseat Habecker. It was not a private endeavor; it was a public spectacle orchestrated by the Non-Town Defendants in conjunction with officials of the Town of Estes Park.

## V.  CONCLUSION

As stated earlier, Plaintiffs submit that the obvious remedy is to declare "under God" in the Pledge of Allegiance unconstitutional and order that it be excised from the Pledge. While this will not restore Habecker to public office, it would have two beneficial effects. First, it would remove an impediment to Habecker's running for re-election[10] and, second, it would prevent this tragedy from repeating itself by eliminating the government practice which is the root of the problem. The

---

[10]  In his deposition, Habecker testified that he would not be likely to run for reelection if recitation of the Pledge continues because he would simply find himself running again "on my religious convictions." (Habecker deposition, p. 10).

18

fact that the recall has taken place and Habecker cannot be made entirely whole does not extinguish his right to relief.  *See*, e.g., *Lee v. Weisman*, *supra*, where the Court enjoined "nonsectarian prayer" at a public school commencement even though the offending commencement ceremony at issue had long since been held.  *See also Santa Fe Independent School Dist.* v. *Doe*, *supra*, where the Court granted relief five years after the contested practice had occurred.

For the foregoing reasons, it is respectfully requested that the Court grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

s/   Robert R. Tiernan
Robert R. Tiernan
3165 S. Waxberry Way
Denver, CO  80231
Telephone:  (303) 671-2490
FAX: (303) 743-7810
E-mail: jwells1960@netzero.com
Attorney for the Plaintiffs

19

## CERTIFICATE OF SERVICE

I hereby certify that on ____July 30, 2005____, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

sdawes@lhdlaw.com

msanders@lhdlaw.com

dostermeier@lhdlaw.com

lcochran@lhdlaw.com

hcphillips@hphclaw.com

mla@hphclaw.com

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner indicated by the non-participant's name:

Dewey Shanks                     Via U.S. Mail

P.O. Box 635

Estes Park, CO 80517


s/   Robert R. Tiernan

Robert R. Tiernan

Attorney for the Plaintiffs

3165 S. Waxberry Way

Denver, CO  80231

Telephone:  (303) 671-2490

FAX: (303) 743-7810

E-mail: jwells1960@netzero.com