IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-CV-00153-OWN-MJW

DAVID HABECKER and THE FREEDOM FROM RELIGION FOUNDATION, INC.,

      Plaintiffs,

v.

TOWN OF ESTES PARK, COLORADO;
BOARD OF TRUSTEES OF THE TOWN OF ESTES PARK, COLORADO;
LORI JEFFREY-CLARK, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
SUE DOYLEN, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
CHUCK LEVINE, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
WAYNE NEWSOME, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
BILL PINKHAM, TRUSTEE OF THE TOWN OF ESTES PARK, COLORADO;
JOHN BAUDEK, MAYOR OF THE TOWN OF ESTES PARK, COLORADO;
VICKIE O'CONNOR, TOWN CLERK OF THE TOWN OF ESTES PARK, COLORADO;
GREG WHITE, TOWN ATTORNEY FOR THE TOWN OF ESTES PARK, COLORADO;
ESTES PARK CITIZENS FOR REPRESENTATIVE GOVERNMENT;
DEWEY SHANKS, MEMBER, ESTES PARK CITIZENS FOR REPRESENTATIVE
GOVERNMENT;
NORMAN D. PRITCHARD, MEMBER, ESTES PARK CITIZENS FOR REPRESENTATIVE
GOVERNMENT; and
RICHARD H. CLARK, MEMBER, ESTES PARK CITIZENS FOR REPRESENTATIVE
GOVERNMENT,

      Defendants.

---

**BRIEF OF INTERVENOR UNITED STATES OF AMERICA
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1. Legal Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      3. Plaintiffs' Claims in This Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      4. Response to Plaintiffs' Statement of Undisputed
         Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      PLAINTIFFS LACK STANDING TO PURSUE THEIR
        CHALLENGES TO THE PLEDGE AND TO THE TOWN'S
        PLEDGE PRACTICE, AND IN ANY EVENT, THOSE
        CHALLENGES ARE MOOT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.     Plaintiffs Lack Standing To Challenge the
              Pledge Statute On Its Face . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.     Plaintiffs Lack Standing To Challenge The Town's
              Pledge Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.     Plaintiffs' Claims Are Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.     4 U.S.C. § 4 IS CONSTITUTIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.     The Establishment Clause Permits Official Acknowledgments Of
              The Nation's Religious History And Character . . . . . . . . . . . . . . . . . . . . . . . 14

B.      The Pledge of Allegiance, With Its Reference To A Nation "Under God," Is A Constitutionally Permissible Acknowledgment Of The Nation's Religious History And Character . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.    THE TOWN'S PLEDGE PRACTICE IS CONSTITUTIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A.      The Purpose Of Reciting The Pledge Is To Promote Patriotism And National Unity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.      The Pledge Has The Valid Secular Effect Of Promoting Patriotism And National Unity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.      The Pledge must be considered as a whole . . . . . . . . . . . . . . . . . . . . . . 32

        2.      Reciting the Pledge is not a religious exercise . . . . . . . . . . . . . . . . . . . . 34

        3.      The Town's Pledge-recital practice is not Coercive . . . . . . . . . . . . . . . . 37

C.      Recitation of the Pledge of Allegiance Does Not Constitute A "Religious Test for Public Office" in Violation of Article VI of the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

.

**TABLE OF AUTHORITIES**

**CASES**

Agostini v. Felton,
521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 30, 37

Allen v. Wright,
468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

American Forest Forest & Paper Ass'n v. US EPA,
154 F.3d 1155 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Anderson v. Laird,
316 F. Supp. 1081 (D.D.C. 1970),
rev'd on other grounds, 466 F.2d 263
(D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Bowen v. Roy,
521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Board of Education v. Mergens,
496 U.S. 226 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Capitol Square Review & Advisory Bd. v. Pinette,
515 U.S. 753 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Chaudhuri v. Tennessee,
130 F.3d 232 (6th Cir. 1997), cert. denied,
523 U.S. 1024 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

County of Allegheny v. American Civil Liberties Union,
492 U.S. 573 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Diamond v. Charles,
476 U.S. 54 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Edwards v. Aguillard,
482 U.S. 578 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Elk Grove Unified Sch. District v. Newdow,
___ U.S. ___; 124 S. Ct. 2301 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Engel v. Vitale,
     370 U.S. 421 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FW/PBS, Inc. v. City of Dallas,
     493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Freethought Soc'y v. Chester County,
     334 F.3d 247 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Gaylor v. United States, 74 F.3d 214 (10th Cir.),
     cert. denied, 517 U.S. 1211 (1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 19, 20

Grove v. Mead Sch. Dist. No. 354,
     753 F.2d 1528 (9th Cir.), cert. denied,
     474 U.S. 826 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Lambeth v. Board of Comm'rs of Davidson County ,
     407 F.3d 266 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Lankford v. City of Hobart,
     73 F.3d 283 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Lee v. Weisman,
     505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Lemon v. Kurtzman,
     403 U.S. 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 29, 32

Lujan v. Defenders of Wildlife,
     504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Lynch v. Donnelly,
     465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

 Marsh v. Chambers,
     463 U.S. 783 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 36, 40

McCreary County v. American Civil Liberties Union,
     __ U.S. __; 125 S.Ct. 2722 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

McGowan v. Maryland,
     366 U.S. 420 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29, 41

Moongate Water Co., Inc. v. Dona Ana Mutual
Domestic Water Consumers Assn,
    __ F.3d __;  2005 WL 1785324
(10th Cir. July 28, 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Myers v. Loudon County Sch. Board,
    251 F. Supp. 2d 1262 (E.D. Va. 2003),
    aff'd, ___ F.3d ___; 2005 WL 1879911
    (4th Cir.  Aug. 10, 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 23, 24, 25, 31, 36, 39

Newdow v. Bush,
     335 F. Supp. 2d 265 (D.D.C. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Newdow v. The Congress of the United States, et al.,
    No. 2:05-CV-00017-LKK-DAD (E.D. Cal.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Nova Health Systems  v. Gandy,
    416 F.3d 1144 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7, 10, 12

O'Connor v. Washburn University,
    416 F.3d 1216  (10th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Rostker v. Goldberg,
    453 U.S. 57 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Santa Fe Indep. Sch. Dist. v. Doe,
    530 U.S. 290 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 32, 40

Schaffer v. Clinton,
    240 F.3d 878 (10th Cir.),
    cert denied, 534 U.S. 992 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8

School Dist. of Abington Township v. Schempp,
    374 U.S. 203 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Seminole Tribe v. Florida,
    517 U.S. 44 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Sherman v. Community Consol. Sch. Dist. 21,
    980 F.2d 437 (7th Cir.1992), cert. denied,
    508 U.S. 950 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 16, 22, 25, 26, 31

Sierra Club  v.Club v. Tri-State Generation and
Transmission Assn,
    173 F.R.D. 275 (D. Colo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Simpson v. Chesterfield County Board of Supervisors,
    404 F.3d 276 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Snyder v. Murray City Corporation,
    159 F.3d 1227 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Southern Utah Wilderness Alliance v. Smith,
    110 F.3d 724 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

State of Utah v. Babbitt,
    137 F.3d 1193 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Tanford v. Brand,
    104 F.3d 982, 985 (7th Cir.), cert. denied,
    522 U.S. 814 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Torcaso  v. Watkins,
    367 U.S. 468 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42, 43, 44

 United States v. Chem. Found., Inc.,
    272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

United States v. National Dairy Prods. Corp.,
    372 U.S. 29 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

United States v. O'Brien,
    391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

United States v. Salerno,
    481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

United States v. Underwood,
    717 F.2d 482 (9th Cir. 1983), cert. denied,
    465 U.S. 1036 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

US Term Limits, Inc. v. Thornton,
    514 U.S. 779 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Valley Forge Christian Coll. v. Americans United
    for Separation of Church and State, Inc.,
    454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Van Orden v. ACLU,
    ___U.S. __; 125 S.Ct. 2854 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32, 37

Wallace v. Jaffree,
    472 U.S. 38 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 26, 31

Walz v. Tax Comm'n,
    319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Ward v. Utah,
    398 F.3d 1239 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

West Virginia Bd. of Ed. v. Barnette
    319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 36, 37, 38

Zelman v. Harris-Simmons,
    536 U.S. 639 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

## CONSTITUTION AND STATUTES

United States Constitution

    U.S. Const., Art. I, §7  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

    U.S. Const., Art. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42, 43

    U.S. Const., Art. VII  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Act of June 22, 1942, ch. 435, § 7, 56 Stat. 380  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Act of Mar. 3, 1865, ch. 100, § 5, 13 Stat. 518  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Act of June 14, 1954, ch. 297, § 7, 68 Stat. 249  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Act of Nov. 13, 2002, Pub. L. No. 107-293, 116 Stat. 2057 . . . . . . . . . . . . .  3, 13, 15, 17

4 U.S.C. § 4  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  <u>passim</u>

31 U.S.C. § 5112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

36 U.S.C. § 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 37

Colo. Rev. Stat. Ann. §  22-1-106(3) (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

### MISCELLANEOUS

Brief for the United States as Respondent Supporting Petitioners,
   Appendix B, No. 02-1624 (U.S. Dec. 2003),
   <u>available</u> <u>at</u> 2003 WL 23051994  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Declaration of Independence, 1 U.S.C. at XLIII . . . . . . . . . . . . . . . . . . . . . . . .  15, 37

H.R. Rep. No. 2047, 77th Cong., 2d Sess. 1 (1942)  . . . . . . . . . . . . . . . . . . . . . . .  3

H.R. Rep. No. 659, 107th Cong., 2d Sess. (2002)
   <u>reprinted</u> <u>in</u>, 2002 U.S.C.C.A.N. 1304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

H.R. Rep. No. 1693, 83d Conf., 2d Sess. (1954)
   <u>reprinted</u> <u>in</u> 1954 U.S.C.C.A.N. 2339  . . . . . . . . . . . . . . . . . . . . . . .  3, 14, 26, 27, 28

<u>The Random House Dictionary of the English Language</u>
   (2d ed. 1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

S. Rep. No. 1477, 77th Cong., 2d Sess. (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

S. Rep. No. 1287, 83d Cong., 2d Sess. (1954) . . . . . . . . . . . . . . . . . . . . . . . . .  3, 26, 27

100 Cong. Rec. 1700 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Laurence H. Tribe, <i>American Constitutional Law</i> (2d ed. 1988) . . . . . . . . . . . . . . . . .  43

## PRELIMINARY STATEMENT

This case challenges the constitutionality of 4 U.S.C. § 4, a federal statute codifying the wording of the Pledge of Allegiance to the Flag ("Pledge"), and the practice of the Board of Trustees of the Town of Estes Park, Colorado ("the Town") of reciting the Pledge at the beginning of each of its Board meetings.  Plaintiffs claim that the Pledge, and the Town's Pledge practice, violate the First Amendment because the Pledge contains the words "under God."  Plaintiffs seek a declaration that 4 U.S.C. § 4 violates the First Amendment.

Plaintiffs' claims, insofar as they pertain directly to the United States,  relate to their contention that 4 U.S.C. § 4 ("the Pledge statute") is unconstitutional on its face.  These claims should be dismissed because plaintiffs lack standing to challenge the Pledge statute.  That statute does not compel anyone to recite the Pledge, or to lead others in reciting it.  Plaintiffs were not compelled by the statute to recite the Pledge in this case and plaintiffs therefore cannot establish that the statute has "injured" them.  Plaintiffs' alleged injury is attributable to the Town's independent decision to recite the Pledge at its Board of Trustee meetings.  Moreover, plaintiff Habecker is no longer is a Trustee - he lost a recall election in March, 2005.  He is not injured by the ongoing practice of reciting the Pledge at Trustee meetings.   Because he does not seek injunctive relief, and does not challenge the voters' decision to recall him, his "injury" is not redressable.  For that reason, his objections to the Pledge are also moot.  He improperly seeks an advisory opinion from this Court on the constitutionality of the Pledge.

Even putting these threshold issues aside, 4 U.S.C. § 4 plainly is constitutional.  Two Supreme Court decisions have said without qualification that the Pledge is consistent with the

Establishment Clause, and have used the Pledge as a baseline for adjudicating the constitutionality of other forms of government action.  Those decisions make clear that the Establishment Clause does not forbid the government from officially acknowledging the religious heritage, foundation, and character of the Nation.  That is all the Pledge does.

Plaintiffs' claims against the Town defendants are founded on the contention that the Town's Pledge practice is unconstitutional.  But Habecker has not shown that he was coerced to recite the Pledge.  Moreover, having been recalled by the voters, Habecker cannot challenge the Trustees' practice of reciting the Pledge.  In any event, reciting the Pledge at Board of Trustee meetings is a patriotic exercise, not a religious testimonial.  The Pledge's reference to God permissibly acknowledges the role that faith in God has played in the formation, political foundation, and continuing development of this Country.

## BACKGROUND

1.   Legal Background

In 1942, as part of an overall effort "to codify and emphasize the existing rules and customs pertaining to the display and use of the flag of the United States of America," Congress enacted a Pledge of Allegiance to the United States flag.  H.R. Rep. No. 2047, 77th Cong., 2d Sess. 1 (1942); S. Rep. No. 1477, 77th Cong., 2d Sess. 1 (1942).  It read:  "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all."  Act of June 22, 1942, ch. 435, § 7, 56 Stat. 380.

Twelve years later, Congress amended the Pledge of Allegiance by adding the words "under God" after the word "Nation."  Act of June 14, 1954, ch. 297, § 7, 68 Stat. 249.  Accordingly, the Pledge of Allegiance, set forth at 4 U.S.C. § 4, now reads:  "I pledge allegiance

2

to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all."  Both the Senate and House Reports expressed the view that, under Supreme Court case law, the amendment "is not an act establishing a religion or one interfering with the 'free exercise' of religion."  H.R. Rep. No. 1693, 83d Cong., 2d Sess. 3 (1954) (citing Zorach v. Clauson, 343 U.S. 306 (1952)), reprinted in 1954 U.S.C.C.A.N. 2339, 2341; see  also S. Rep. No. 1287, 83d Cong., 2d Sess. 2 (1954).

In 2002, Congress enacted legislation that (i) made extensive findings about the historic role of religion in our Nation's political development, (ii) reaffirmed the text of the Pledge as it has "appeared . . . for decades," and (iii) repeated Congress's judgment that the legislation is constitutional both facially and as applied by school districts whose teachers lead willing students in its recitation.  See Act of Nov. 13, 2002, Pub. L. No. 107-293, §§ 1-16, 116 Stat. 2057-2060.

2.  Factual Background

The Board of Trustees of Estes Park is comprised of six Trustees and the Mayor. Scheduling Order (May 10, 2005)(docket no. 54), Undisputed Facts, ¶ 3.  Plaintiff Habecker, an adult citizen,  was a Trustee from 1984 to March, 2005.  Id., ¶¶ 1, 9, 18.  The Board conducts formal meetings twice a month, and it is the duty of each Trustee to attending the meetings, which are open to the public.  Id., ¶ 11.  Beginning in May, 2004, the Mayor announced a new policy of formally opening Board of Trustee meetings with the Pledge of Allegiance.  Id., When the Mayor led the Pledge at the September 14, 2004 Board meeting, plaintiff Habecker remained seated and refrained from saying the Pledge.  Id.  Thereafter, a committee was formed to recall Habecker from office.  Id., ¶ 13.  A recall election occurred in March, 2005, and Habecker lost the recall election and his seat on the Board of Trustees.  Id., ¶ 18.  The Mayor and

Trustees have refused Habecker's request to cease recitation of the Pledge at town meetings, and the Pledge continues to be recited at the beginning of its meetings.  <u>Id.</u>, ¶ 19.

     3.    <u>Plaintiffs' Claims in this Litigation</u>

The two plaintiffs in this case are David Habecker and the Freedom from Religion Foundation ("FFRF").  FFRF alleges that it is a nonprofit corporation that "promote[s] the constitutional principle of separation of church and state and [takes] action on infractions of that principle," that it has members in the District of Colorado who are citizens and taxpayers, and that Habecker is a member of FFRF.  Amended Complaint, May 10, 2005 (docket no. 52)("Amd. Compl."), ¶ 4.  Plaintiffs assert several challenges to 4 U.S.C. § 4 and to the Trustees' practice of reciting the Pledge at town meetings.[1]  Plaintiffs assert that the Pledge of Allegiance is an unlawful "Establishment of Religion," and that the Pledge, "when recited under the circumstances of this case," violates the First Amendment.  <u>Id.</u>  Habecker asserts that the Pledge is "coercive" and that the Trustees' recitation of it placed him in the position of reciting the Pledge and violating his religious convictions, "or refusing to do so and subjecting himself to a recall election."  <u>Id.</u>, ¶ 29.  Habecker contends that the only reason he was subjected to the recall election was due to his exercise of his "constitutional right" to refrain from reciting the Pledge, and that the recall infringed his rights to free speech and to free exercise of religion.  <u>Id.</u>, ¶ 30. Habecker also asserts that subjecting him to the recall constituted a "religious test for public office" in violation of Article VI of the Constitution and violated the religious freedom

---

[1] Named as defendants are the Town of Estes Park, the five members of its Board of Trustees, the Town's Mayor, Clerk, and Town Attorney, the Estes Park Citizens for Representative Government (the citizens group that allegedly sponsored the campaign to recall Habecker from office), and three of its members.  Amd. Compl., ¶¶ 5-12.

provisions of the Colorado Constitution, and provisions of Colorado state law.  Id., ¶¶ 31-35.

On July 30, 2005, plaintiffs filed their motion for summary judgment, in which they set out their challenge to the Pledge of Allegiance statute and the Town's Pledge practice.  Plaintiffs' Motion for Summary Judgment (docket no. 62); Plaintiffs' Opening Brief in Support of  Motion for Summary Judgment (docket no. 63)("Pl. Br.").[2]

4.    Response to Plaintiffs' Statement of Undisputed Material Facts

Pursuant to Local Rule 56.1A, the United States responds as follows to plaintiffs' statement of undisputed Facts, see Pl. Br., at pp. 2-3 (II. Facts), with numbered paragraphs corresponding to the unnumbered paragraphs in plaintiffs' statement.

1.  Admitted.

2.  Admitted.

3.  Admitted as to the first three sentences.  The fourth sentence is disputed in part -- Habecker "pretended to say the Pledge."  According to the deposition transcript, at the May 11, 2004 meeting, and at subsequent meetings, Habecker recited the Pledge of Allegiance out loud except for the words "under God."  See Deposition of David Habecker, June 16, 2005, p. 14, lines 15-23; p. 16, lines 2-22 , p. 74, lines 2-10.  The fifth sentence is admitted insofar as Habecker testified that he felt like a "hypocrite," as stated in the cited deposition.

4.  Admitted as to the text within the paragraph.  The first sentence in the footnote deals with a matter of judicial notice, but the United States has no objection thereto.

---

[2] The United States' arguments are limited to plaintiffs' challenges to the constitutionality of the Pledge of Allegiance and the Town's practice of reciting the Pledge at Trustee meetings (their Establishment Clause, "free exercise," and Article VI claims).  It takes no position on plaintiffs' various state law and state constitutional claims.

5.   Admitted.

6.   Admitted.

7.   Admitted.

8.   Admitted.

9.   Admitted

10.   Admitted.

11.   Admitted.

12.   Admitted as to the first sentence.  The United States does not know if Habecker

introduced "all" the e-mails cited in the rest of this paragraph; it assumes that the overall "tally"

is accurate.  Habecker does not identify which e-mails "were highly vindictive."

## ARGUMENT

Our argument proceeds in three parts.  Part I demonstrates that plaintiffs lack standing to

challenge the Pledge statute and the Town's Pledge practice, and that plaintiff Habecker's claims

are, in any event, moot.  Part II demonstrates that 4 U.S.C. § 4 is constitutional.  Part III

demonstrates that the Town's Pledge practice is constitutional.

## I.   PLAINTIFFS LACK STANDING TO PURSUE THEIR CHALLENGES TO THE PLEDGE AND TO THE TOWN'S PLEDGE PRACTICE, AND IN ANY EVENT, THOSE CHALLENGES ARE MOOT.

A plaintiff always has the burden "'clearly to allege facts demonstrating'" standing, i.e.,

that the plaintiff "'is a proper party to invoke judicial resolution of the dispute.'"  FW/PBS, Inc. v.

City of Dallas, 493 U.S. 215, 231 (1990) (citation omitted); Nova Health Systems v. Gandy, 416

F.3d 1149, 1154 (10th Cir. 2005).  To establish constitutional standing, a plaintiff must make

three showings:  that he or she (i) has suffered (or will suffer) an "actual or imminent" injury; (ii)

that is "fairly . . . trace[able] to the challenged action of the defendant"; and (iii) that is "likely" to be "redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)  (quotations and citations omitted) (alteration in original); Nova Health Systems, supra, 416 F.3d at 1154. The standing inquiry "must be 'especially rigorous'" when reaching the merits of the dispute" would require a court to decide "whether an action taken by one of the other two branches of the Federal government" is unconstitutional.  Schaffer v. Clinton, 240 F.3d 878, 882-83 (10th Cir.)(citation omitted), cert. denied 534 U.S. 992 (2001).[3]

As explained below, plaintiffs lack standing to challenge 4 U.S.C. § 4 on its face.  In addition, plaintiffs lack standing to challenge the Town's Pledge practice.  Plaintiff Habecker's challenge is, in any event, moot in view of his having been recalled at the March, 2005 election.

### A.    Plaintiffs Lack Standing To Challenge the Federal Pledge Statute On Its Face

Injury.  With respect to their claim that 4 U.S.C. § 4 is unconstitutional on its face (see, e.g., Pl. Br., at 10, 12), plaintiffs cannot establish the first standing requirement, injury-in-fact.  The statute plainly does not "injure" plaintiffs because it does not compel the State of Colorado, or any of its cities or towns, or anyone else, to recite the Pledge; nor does it compel anyone to lead others in reciting the Pledge.  The statute merely sets forth the words of the Pledge and

_____

[3] See Elkgrove United School Dist. v. Newdow, 542 U.S. 1, __; 124 S.Ct. 2301, 2308 (2003) ("Elkgrove") ("The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake.").  In Newdow, the Court dismissed, for lack of standing, an atheist's challenge to the Pledge of Allegiance and to its recitation in schools in various California school districts, finding that he lacked standing to sue on behalf of his minor daughter.  124 S.Ct., at 2308-12.   Newdow, along with several other parents, filed a new suit challenging the Pledge of Allegiance.  Newdow v. The Congress of the United States, et al., No. 2:05-CV-00017-LKK-DAD (E.D. Cal.)(argued July 18, 2005).

provides the manner of addressing the Flag when the Pledge is recited.

Indeed, it is simply a recently adopted practice of the Trustees, not federal law, which has resulted in the recitation of the Pledge of Allegiance at Town meetings.  To the extent plaintiffs are "injured," therefore, they are injured "as a result of" the Trustees' independent to decision to recite the Pledge, not by the Pledge statute.[4]  State of Utah v. Babbitt, 137 F.3d 1193, 1205 (10th Cir. 1998).  Plaintiffs' philosophical objection to the Pledge is not a cognizable injury.  See, e.g., Allen v. Wright, 468 U.S. 737, 755-756 (1984).  Even in the Establishment Clause context, it is well-established that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."  Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485-486 (1982).  Plaintiffs plainly disagree with the inclusion of the words "under God" in 4 U.S.C. § 4, but their disagreement with the law cannot create standing.  Diamond v. Charles, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements"); Schaffer v. Clinton, supra, 240 F.3d at 884 ("moral outrage" caused by Act of Congress did not provide standing).  Habecker's "injury," to the extent he has described one, is the fact that he longer is a Trustee.  But that "injury" is not the result of the Pledge statute, but the wholly independent action of the Town's voters through the recall

---

[4] For that reason, in several other cases in which plaintiffs challenged state practices of reciting the Pledge, those plaintiffs did not challenge the federal Pledge statute; they challenged instead the application of the state statutes which required recitation of the Pledge.  See Sherman v. Community Consol. Sch. Dist. 21, 980 F.2d 437, 439 (7th Cir. 1992) (upholding Illinois statute), cert. denied, 508 U.S. 950 (1993); Myers v. Loudon County Public Schools, __ F.3d ___; 2005 WL 1879911 (4th Cir. Aug. 10, 2005) (upholding Virginia statute).

election.

Plaintiffs' failure to show injury is illustrated by the inclusion of the Freedom from Religion Foundation ("FFRF") as a plaintiff in the amended complaint.   Other than Habecker, FFRF identifies no individual member residing in Estes Park (or even Colorado) who has been specifically affected by the Pledge, or in what context.  See Amd. Compl., ¶ 4.  An association has standing to sue on behalf of its members if (a) its members would otherwise have standing to sue in their own right (b) the interests it seeks to protect are germane to the organization's purpose and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the law suit.  American Forest & Paper Ass'n v. US EPA, 154 F.3d 1155, 1158 (10th Cir. 1998).  In this case, however, there is no specificity at all to FFRF's claims.[5] Whatever its specific interest in the constitutionality of the Pledge (and it fails to identify how its work would be impaired by the existence or recitation of the Pledge), it cannot assert the claims of unidentified individuals.  The participation of such individuals would be required in order to address any specific claims they might have to assert against the Pledge or the Town's recitation practice.

Traceability and Redressability.  Plaintiffs also cannot establish "a causal connection between the injury and the conduct complained of," i.e., that the injury is "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party[.]"  Lujan, 504 U.S. at 560 (citations omitted) (alterations in original).  As

_____

[5] This case is far different from Sierra Club v. Tri-State Generation and Transmission Assn, 173 F.R.D. 275, 280 (D. Colo. 1997), in which plaintiffs had alleged that defendants' actions "have impaired the ability of its members who live, work, and recreate in the Yampa Valley to breathe clean air and view natural scenery and wildlife. . . ."

explained above, the Pledge statute does not compel anyone to recite the Pledge or lead others in reciting it.  There is no "causal connection," therefore, between plaintiffs' "injury" and "the challenged action of the" federal defendants.  See id.; see Nova Health Systems, supra, 416 F.3d at 1156 (holding that the potential for loss of minor patients by abortion provider was not traceable to a statute imposing certain liabilities on such providers).

To the extent that Habecker has been "injured" by the Pledge, it is not traceable to the statute itself, but at most, to the Trustees' independent decision to recite it.  Neither Habecker's recitation of the Pledge -- nor the loss of his Trustee position – is fairly attributable to the statute. Instead, Habecker's situation arises out of the voters' separate decision to recall him from office.[6] Habecker implicitly admits that his objection is to "how . . . the Pledge [was] used in *this* case," and attributes his election loss to "the *animus*" of the voters directed at him because he disagreed with the Town's Pledge practice.  Pl. Br., at 12.

Finally, plaintiffs' claims as to the Pledge are not redressable.  Plaintiffs seek exclusively declaratory relief from this Court.  Pl. Br., at 16, 18-19.   Habecker does not appear to seek any injunction that would lead to his restoration to office, the only "injury" he asserts.  Habecker admits that "[t]here appears to be no legal or practical way to reconstruct matters in a way that would make Habecker whole."  Id., at 10.  He concedes that a declaratory judgment "will not restore [him] to public office," but simply would "remove an impediment to [his] running for reelection."  Id., at 18.  In fact, at his deposition, he testified that he "probably" would not seek

---

[6] For Habecker to assert that he lost the recall election "because, and only because, of the Pledge of Allegiance," Pl. Br., at 10, is pure speculation.  While Habecker asserts that some citizens specifically objected to his stance on reciting the Pledge, id., at 4, 10, he cannot generalize or attribute specific motives to the Town electorate as a whole.

election.[7]  His brief acknowledges the fact that "the recall has taken place and Habecker cannot

be made entirely whole. . . ."  Id., at 19.  These concessions show that Habecker seeks an

advisory opinion from this Court, to "prevent this tragedy from repeating itself . . ." in Estes

Park, or in other localities.  Id., at 1.

   For all of these reasons, plaintiffs lack standing to challenge 4 U.S.C. § 4.

**B.      Plaintiffs Lack Standing To Challenge The Town's Pledge
Practice**

For similar reasons, plaintiffs lack standing to challenge the Town's Pledge practice.

Habecker's "injury" is not attributable to the Pledge's recitation, but to the independent act of the

voters in recalling him from office.  Moreover, that injury cannot be redressed.[8]  Habecker

essentially concedes that the voters' decision is not judicially reviewable.  Pl. Br., at 12.

**C**.      **Plaintiffs' Claims are Moot**

Under Article III, courts can adjudicate only "live controversies."  Moongate Water Co.,

Inc. v. Dona Ana Mutual Domestic Water Consumers Ass'n, __ F.3d __; 2005 WL 1785324, at

*5 (10th Cir. July 28, 2005).  Courts cannot issue advisory opinions where no such controversy

exists.  Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997) ("A

federal court has no power to give opinions upon moot questions or declare principles of law

---

    [7] Deposition of David Habecker, June 16, 2005, p. 10, lines 8-11; see Pl., Br., at 18 n.10
(characterizing Habecker's position as being that he "would not likely run for reelection if
recitation of the Pledge continues . . .").

    [8] Although Habecker cites Lee v. Weisman, 505 U.S. 577 (1992),  for the proposition
that this Court can adjudicate his challenge to the Pledge, Lee is distinguishable.  The Court
assumed that the plaintiff student  (who objected to a prayer at her middle school graduation)
would be subjected to a similar prayer at her high school graduation.  Id., at 583.

which cannot affect the matter in issue in the case before it."). Accordingly a case may become moot;  Article III mootness is "the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)." Id.

In this case, assuming, arguendo, that Habecker had standing to challenge the Pledge statute, or the Trustees' recitation of the Pledge, at the beginning of this litigation, any such standing ceased once he ceased to be a Trustee.  As a former Trustee he is no longer faced with the dilemma (to the extent that could be identified as an "injury") of reciting the Pledge.  The intervening event of Habecker's being  recalled from office in March, 2005 means that there is no "case or controversy."  See Pl. Br., at 4, 10.  As demonstrated supra, Habecker has conceded that the only relief to which he would be entitled would be declaratory relief.  Habecker is no longer a Trustee and has not asserted that he will run for reelection. To resolve his objection to the Pledge would be to render an advisory opinion.  See Nova Health Systems, supra, 416 F.3d at 1159 (declining to issue declaratory judgment on theory that the judgment might deter others from relying on challenged statute); Lankford v. City of Hobart, 73 F.3d 283, 288 (10th Cir. 1996)("because no legal remedies are available to plaintiffs a verdict in their favor would do little more than provide them with emotional satisfaction.  Such satisfaction is not an appropriate remedy under these circumstances.").

## II.     4 U.S.C. § 4 IS CONSTITUTIONAL

If the Court reaches the merits of plaintiffs' challenge to 4 U.S.C. § 4, that challenge should be rejected.  Plaintiffs ask the Court "to judge the constitutionality of an Act of Congress — 'the gravest and most delicate duty that [a court] is called upon to perform.'"  Rostker v. Goldberg, 453 U.S. 57, 64 (1981) (citation omitted).  It is well established that Acts of Congress are presumptively constitutional.  See United States v. National Dairy Prods. Corp., 372 U.S. 29, 32 (1963).  Congress expressly has reaffirmed its view that 4 U.S.C. § 4 is constitutional.  See Act of Nov. 13, 2002, Pub. L. No. 107-293, §§ 1-16, 116 Stat. 2057-2060.  Moreover, because plaintiffs challenge the Pledge statute on its face, to be successful, they must show that "no set of circumstances exists under which the [challenged statute] would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987); see Ward v. Utah, 398 F.3d 1239, 1246 (10th Cir. 2005)("Because facial challenges push the judiciary towards the edge of its traditional purview and expertise, courts must be vigilant in applying a most exacting analysis to such claims.").

Plaintiffs cannot meet this test.  First, since this country's founding, there have been official acknowledgments about the role of religion in our nation and society.  The Pledge is simply part of that historical understanding.   Second, two Supreme Court decisions have said without qualification that the Pledge is consistent with the Establishment Clause, and have used the Pledge as a baseline for adjudicating the constitutionality of other forms of government action.   Numerous other Supreme Court opinions likewise have expressly addressed and affirmed the constitutionality of the Pledge.  These decisions and opinions make clear that the Establishment Clause does not forbid the government from officially acknowledging the religious heritage, foundation, and character of the Nation.  That is precisely what the Pledge of

Allegiance does. The Pledge statute does not violate the Establishment Clause.[9]

Plaintiffs' principal contentions are that the Pledge of Allegiance and the Town's Pledge practices violate the Establishment Clause as an unconstitutional endorsement of religion, and are unconstitutionally coercive.  Pl. Br., at 6-10.  These claims are without merit.

A.    **The Establishment Clause Permits Official Acknowledgments Of The Nation's Religious History And Character**

"[R]eligion has been closely identified with our history and government."  <u>School Dist. of Abington Township v. Schempp</u>, 374 U.S. 203, 212 (1963); <u>see</u> <u>also</u> <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1; 124 S.Ct. 2301, 2306 (2004) ("'[f]rom the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God.'") (quoting H.R. Rep. No. 1693, 83d Cong., 2d Sess., p. 2 (1954)) (alteration in original).  Many of the Country's earliest European settlers came here seeking refuge from religious persecution and a home where they could practice their faith.  <u>See</u> <u>Elk Grove</u>, 124 S.Ct. at 2322 (O'Connor, J., concurring) (describing "a Nation founded by religious refugees and dedicated to religious freedom").  In 1620, before embarking for America,

---

[9] This Circuit has applied the test from <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971), to determine whether a government action violates the Establishment Clause.  Under that test, government action does not violate the Clause if it (1) has a secular purpose, (2) does not have the principal or primary effect of advancing or inhibiting religion, and (3) does not foster an excessive entanglement of government with religion.  <u>O'Connor v. Washburn University</u>, 416 F.3d 1216, 1224  (10th Cir. 2005).  The Court has noted that Justice O'Connor has offered a refined version" of the <u>Lemon</u> test, <u>i.e.</u>, the government "impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred." <u>Id.</u> (citation omitted).  This Circuit has applied both the purpose and effect components of the refined endorsement test, together with the entanglement criterion imposed by <u>Lemon</u>, in evaluating Establishment Clause claims.  <u>Id.</u>  See <u>Agostini v. Felton</u>, 521 U.S. 203, 233 (1997)(the "entanglement" prong of <u>Lemon</u> is treated as an aspect of the "primary effect" inquiry).

the Pilgrims signed the Mayflower Compact in which they announced that their voyage was undertaken "for the Glory of God."  See Act of Nov. 13, 2002, Pub. L. No. 107-293, § 1, 116 Stat. 2057.  Settlers established many of the original thirteen colonies for the specific purpose of securing religious liberty for their inhabitants.  See Engel v. Vitale, 370 U.S. 421, 427, 434 (1962).

The Framers' deep-seated faith provided the philosophical groundwork for the governmental structure they adopted.  See Lynch v. Donnelly, 465 U.S. 668, 675 (1984) ("'[w]e are a religious people *whose institutions* presuppose a Supreme Being'") (citation omitted) (emphasis added).  In "perhaps their most important contribution," the Framers "conceived of a Federal Government directly responsible to the people . . . and chosen directly . . . by the people." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 821 (1995).  That system of government was a direct outgrowth of the Framers' conviction that each individual was entitled to certain fundamental rights "endowed by their Creator."  As most famously expressed in the Declaration of Independence:  "[w]e hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."  1 U.S.C. at XLIII; see also Schempp, 374 U.S. at 213 ("[t]he fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself").

It is no surprise, therefore, that the Framers considered references to God in official documents and official acknowledgments of the role of religion in the history and public life of the Country to be consistent with the principles of religious autonomy embodied in the First

Amendment.  The Constitution itself refers to the "Year of Our Lord" and excepts Sundays from the ten-day period for exercise of the presidential veto.  See U.S. Const. Art. I, § 7; id. Art. VII. And the First Congress, which wrote the Establishment Clause, adopted a policy of selecting a paid chaplain to open each session of Congress with prayer.  See Marsh v. Chambers, 463 U.S. 783, 787-88 (1983).

Indeed, the day after proposing the Establishment Clause, the First Congress urged President Washington "to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God.'"  Lynch, 465 U.S. at 675 n.2 (citation omitted).  The President responded by proclaiming November 26, 1789, a day of thanksgiving to "offe[r] our prayers and supplications to the Great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions."  Id. (citation omitted).  President Washington also included a reference to God in his first inaugural address, stating:  "'it would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe . . . that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes.'"  Newdow v. Bush, 355 F.Supp.2d 265, 287 (D.D.C. 2005) (quoting compilation of inaugural addresses).

This "tradition [of the Founders] has endured."  Sherman, 980 F.2d at 446.  Beginning with President Washington, references to God or a Higher Power have been a "characteristic feature" of presidential inaugural addresses, see Lee, 505 U.S. at 633 (Scalia, J., dissenting), and almost every President, beginning with Washington, has issued Thanksgiving proclamations. See Elk Grove, 124 S.Ct. at 2317 (Rehnquist, C.J., concurring).  Since the time of Chief Justice

16

Marshall, moreover, the Supreme Court has opened its sessions with "God save the United States and this Honorable Court."  <u>Engel</u>, 370 U.S. at 446 (Stewart, J., dissenting).

Other examples abound.  President Lincoln referred to a "nation[] under God" in his historic Gettysburg Address.  <u>See</u> <u>Elk Grove</u>, 124 S.Ct. at 2317-18 (Rehnquist, C.J., concurring).  In 1865, Congress authorized the inscription of "In God we trust" on United States coins.  <u>See</u> Act of Mar. 3, 1865, ch. 100, § 5, 13 Stat. 518.  In 1931, Congress adopted as the National Anthem "The Star-Spangled Banner," the fourth verse of which reads:  "Blest with victory and peace, may the heav'n rescued land Praise the Pow'r that hath made and preserved us a nation!  Then conquer we must, when our cause it is just, And this be our motto 'In God is our Trust.'"  <u>Engel</u>, 370 U.S. at 449 (Stewart, J., dissenting).

In 1956, Congress passed legislation to make "In God we trust" the National Motto, <u>see</u> 36 U.S.C. § 302, and provided that it be inscribed on all United States currency, <u>see</u> 31 U.S.C. § 5112(d)(1), above the main door of the Senate, and behind the Chair of the Speaker of the House of Representatives.  <u>See</u> Act of Nov. 13, 2002, Pub. L. No. 107-293, § 10, 116 Stat. 2058; <u>Gaylor v. United States</u>, 74 F.3d 214, 217-18 (10th Cir.), <u>cert.</u> <u>denied</u>, 517 U.S. 1211 (1996) (the motto and its appearance on the currency does not violate the Establishment Clause); <u>Lambeth v. Board of Comm'rs of Davidson County</u>, 407 F.3d 266, 270-73 (4th Cir. May 13, 2005) (the motto on government building does not violate Establishment Clause).[10]

Given this "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789," <u>Lynch</u>, 465 U.S. at 674,

---

[10]   The Constitutions of all 50 States also include express references to God.  <u>See</u> Brief for the United States as Respondent Supporting Petitioners, Appendix B, No. 02-1624 (U.S. Dec. 2003), <u>available</u> <u>at</u> 2003 WL 23051994.

17

the Supreme Court and individual Justices, time and again, have affirmed the proposition that official acknowledgments of the Nation's religious heritage and character are constitutional.  See, e.g., Marsh, 463 U.S. at 792 (opening legislative sessions with prayer "has become part of the fabric of our society"); Schempp, 374 U.S. at 213 (referring favorably to the numerous public references to God that appear in historical documents and ceremonial practices in public life, such as oaths ending with "So help me God"); Lynch, 465 U.S. at 676 (referring favorably to the National Motto, "In God We Trust"); Elk Grove, 124 S. Ct. at 2319 (Rehnquist, C.J., concurring) ("our national culture allows public recognition of our Nation's religious history and character."); id. at 2322 (O'Connor, J., concurring) (eradicating references to divinity in our Nation's symbols, songs, mottos, and oaths is unnecessary and "would sever ties to a history that sustains this Nation even today"); Lynch, 465 U.S. at 693 (O'Connor, J., concurring) ("In God We Trust" and "God save the United States and this honorable court" are constitutionally permissible acknowledgments of religion); Schempp, 374 U.S. at 307 (Goldberg, J., concurring, joined by Harlan, J.) ("today's decision does not mean that all incidents of government which import of the religious are therefore and without more banned by the strictures of the Establishment Clause," citing to divine references in the Declaration of Independence and official Anthems); Engel, 370 U.S. at 449 (Stewart, J., dissenting) (citing as consistent with the Establishment Clause the National Motto "In God We Trust," which is "impressed on our coins").

Such official acknowledgments of religion are consistent with the Establishment Clause because they do not "establish[] a religion or religious faith, or tend[] to do so."  Lynch, 465 U.S. at 678; see also Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970) (Establishment Clause forbids "sponsorship, financial support, and active involvement of the sovereign in religious activity").

18

Rather, "public acknowledgment of the [Nation's] religious heritage long officially recognized by the three constitutional branches of government," Lynch, 465 U.S. at 686, simply takes note of the historical *facts* that "religion permeates our history," Edwards v. Aguillard, 482 U.S. 578, 607 (1987) (Powell, J., concurring), and, more specifically, that religious faith played a singularly influential role in the settlement of the Nation and the founding of its government.  Because of their "'history and ubiquity,' such government acknowledgments of religion are not understood as conveying an endorsement of particular religious beliefs." County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 625 (1989) (O'Connor, J., concurring) (citation omitted).

The Tenth Circuit, applying this precedent, has rejected a similar challenge to the constitutionality of the use of the national motto, "In God We Trust," including its reproduction on United States currency.  Gaylor v. United States, 74 F.3d 214, 216 (10th Cir.), cert. denied, 517 U.S. 1211 (1996).  The Court found, inter alia, that "[t]he statutes establishing the national motto and directing its reproduction on U.S. currency clearly have a secular purpose," and that the "motto symbolizes the historical role of religion in our society. . . ."  Id.  The Court similarly found that the "primary effect" of the motto was not to advance religion, but rather is "a form of 'ceremonial deism' which through historical usage and ubiquity cannot be reasonably understood to convey government approval of religious belief."  Id.  The Court also concluded that "a reasonable observer, aware of the purpose, context, and history of the phrase 'in God we trust,' would not consider its use or its reproduction on U.S. currency to be an endorsement of religion." Id., at 217.  Finally, its decision was "confirmed" by statements of the Supreme Court and other courts that had "considered in dicta the motto and the pledge [of allegiance], characterizing them as consistent with the proposition that government may not communicate an endorsement of

19

religious belief." <u>Id.</u>, <u>citing Allegheny</u>, 492 U.S. at 602-03.  The Court "considers itself bound by Supreme Court dicta, almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." <u>Id.</u>

    **B.**    **The Pledge of Allegiance, With Its Reference To A Nation "Under God," Is A Constitutionally Permissible Acknowledgment Of The Nation's Religious History and Character**

For four decades, opinions of the Supreme Court and of individual Justices have affirmed the constitutionality of the Pledge, characterizing its reference to God as a permissible acknowledgment of the Nation's religious heritage and character.  <u>See</u>, <u>e.g.</u>, <u>Elk Grove</u>, 124 S.Ct. at 2317 (Rehnquist, C.J., concurring) ("[t]he phrase 'under God' in the Pledge seems, as a historical matter, to sum up the attitude of the Nation's leaders. . .").  Two opinions of the Supreme Court have expressly discussed the Pledge.  In <u>Lynch v. Donnelly</u>, the Court held that the Establishment Clause permits a city to include a nativity scene as part of its Christmas display.  The Court reasoned that the creche permissibly "depicts the historical origins of this traditional event long recognized as a National Holiday."  465 U.S. at 680.  Earlier in its opinion, the Court had noted that similar "examples of reference to our religious heritage are found," among other places, "in the language 'One nation under God,' as part of the Pledge of Allegiance to the American flag," which "is recited by many thousands of public school children — and adults — every year." <u>Id.</u>, 465 U.S. at 676.  The words "under God" in the Pledge, the Court explained, are an illustration of "the Government's acknowledgment of our religious heritage," <u>id.</u>, 465 U.S. at 677, similar to "countless other illustrations," <u>id.</u>, such as the "official references to the value and invocation of Divine guidance in deliberations and pronouncements of the

Founding Fathers" that are "replete" in our nation's history.  Id., 465 U.S. at 675.

Likewise, in County of Allegheny, the Supreme Court sustained the inclusion of a

Menorah as part of a holiday display, but invalidated the isolated display of a creche at a county

courthouse.  In so holding, the Court reaffirmed Lynch's approval of the reference to God in the

Pledge, noting that all of the Justices in Lynch viewed the Pledge as "consistent with the

proposition that government may not communicate an endorsement of religious belief."  492 U.S.

at 602-603 (citations omitted).  The Court then used the Pledge and the general holiday display

approved in Lynch as benchmarks for what the Establishment Clause permits, id., and concluded

that the display of the creche by itself would be unconstitutional because, unlike the Pledge and

other "nonsectarian references to religion by the government," id., the creche gave "praise to God

in [sectarian] Christian terms."  Id., 492 U.S. at 598; see id., 492 U.S. at 603.

Although these decisions did not involve direct challenges to the Pledge, they are

controlling regarding the Pledge's constitutionality.  "When an opinion issues for the [Supreme]

Court, it is not only the result but also those portions of the opinion necessary to that result by

which we are bound."  Seminole Tribe v. Florida, 517 U.S. 44, 67 (1996).  The Supreme Court's

analysis of the Pledge in Lynch and County of Allegheny was an integral part of the rationale

upon which the Court decided those cases.  That analysis provided the constitutional baseline for

permissible official acknowledgments of religion against which the practices at issue in each of

those cases were then measured.  For decades, in fact, the Supreme Court and individual Justices

"have grounded [their] decisions in the oft-repeated understanding," Seminole Tribe, 517 U.S. at

67, that the Pledge of Allegiance, and similar references, are constitutional.  The Court's specific

statements in Lynch and County of Allegheny supporting the Pledge's constitutionality thus are

21

decisive.  See Gaylor v. United States, supra, 74 F.3d at 217 ("this Court considers itself bound by Supreme Court dicta, almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."); Sherman, 980 F.2d at 448 ("If the [Supreme] Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously.  If the Justices are just pulling our leg, let them say so."); United States v. Underwood, 717 F.2d 482, 486 (9th Cir. 1983) ("[a] lower federal court cannot responsibly decline to follow a principle directly and explicitly stated by the Supreme Court as a ground of decision and subsequently applied by the Supreme Court as an integral part of a systematic development of constitutional doctrine"), cert. denied, 465 U.S. 1036 (1984).

Although controlling in their own right, the majority statements in Lynch and County of Allegheny are consistent with the individual opinions of numerous Justices over the past four decades which have specifically endorsed the constitutionality of the Pledge.  See County of Allegheny, 492 U.S. at 674 n.10 (Kennedy, J., concurring in part and dissenting in part, joined by Rehnquist, C.J., and White and Scalia, JJ.); Wallace v. Jaffree, 472 U.S. 38, 78 n.5 (1985) (O'Connor, J., concurring); id., 472 U.S. at 88 (Burger, C.J., dissenting); Schempp, 374 U.S. at 304 (Brennan, J., concurring); Engel, 370 U.S. at 440 n.5 (Douglas, J., concurring); id., 370 U.S. at 449-50 (Stewart, J., dissenting).

In Elk Grove, the three concurring Justices who reached the merits specifically concluded that recitation of the Pledge by willing students in public schools does not violate the Establishment Clause.  See id. at 2312, 2320 (Rehnquist, C.J., & O'Connor, J., concurring) ("[t]he recital, in a patriotic ceremony pledging allegiance to the flag and to the Nation, of the descriptive phrase 'under God' cannot possibly lead to the establishment of a religion, or anything

22

like it"); id. at 2321,  2323 (O'Connor, J., concurring) (phrase "under God" in the Pledge is a form of "ceremonial deism" permissible under the Establishment Clause); id. at 2333 (Thomas, J., concurring) (public school Pledge recitation policy constitutional because it does not create or maintain any religious establishment, grant government authority to an existing religion, or expose anyone to the legal coercion associated with an established religion).[11]

Two Circuits have upheld the recitation of the Pledge, applying these legal principles. First, the Fourth Circuit recently rejected a challenge to Virginia's voluntary Pledge recitation statute.  Myers v. Loudon County Public Schools, __ F.3d __; 2005 WL 1879911 (4th Cir. Aug. 10, 2005).[12]  Judge Williams' own opinion noted the history of various official acknowledgments of religion in American life that had not been challenged as establishments of religion.  Id., at **5-6.  He noted that "[i]f the founders viewed legislative prayer and days of thanksgiving as consistent with the Establishment Clause, it is difficult to believe they would object to the Pledge, with its limited reference to God. The Pledge is much less of a threat to establish a religion than legislative prayer, the open prayers to God found in Washington's prayer of thanksgiving, and the Declaration of Independence."  Id., at *7.  Judge Williams and Judge Duncan both concluded that the Supreme Court and individuals Justices "have made clear that

---

[11] Justice Thomas also would have upheld Elk Grove's Pledge policy.  His conclusion was based in part on his view that an earlier Supreme Court decision, Lee v. Weisman, 505 U.S. 577 (1992), discussed infra, was wrongly decided.  Elk Grove, 124 S.Ct. at 2330-33; id., 2328 ("[a]dherence to Lee would require us to strike down the Pledge policy. . .").

[12] Although the panel's opinion was written by Judge Williams, Judge Motz joined only the judgment, while Judge Duncan joined part of the opinion.  Judge Motz, however, remarked: "The Supreme Court has spoken repeatedly on the precise issue we address today. The Court has consistently said that inclusion of the phrase 'under God' in the Pledge of Allegiance does not offend the Establishment Clause."  2005 WL 1879911, at *12.

the Establishment Clause, regardless of the test to be used, does not extend so far as to make unconstitutional the daily recitation of the Pledge in public school." 2005 WL 1879911, at *7. "Beginning with Engel, in every case in which the Justices . . . have made mention of the Pledge, it has been as an assurance that the Pledge is not implicated by the Court's interpretation of the Establishment Clause." Id.

Judge Williams also noted that "just last term, in Elk Grove, several [J]ustices offered lengthy defense of the constitutionality of a State's policy requiring daily, voluntary, recitation of the Pledge by public school children." Id. at *8. Although the Court held that Newdow lacked standing, "several Justices, took the opportunity to address the question of the Pledge's constitutionality. . . . Each Justice who did so concluded that the Pledge was constitutional." Id. Noting that the court was not "bound by dicta or separate opinions of the Supreme Court," observations by that Court in applying the Establishment Clause jurisprudence were the kind of dicta with "considerable persuasive value in the inferior courts." Id. (Citation and internal quotation marked omitted). It was "perhaps more noteworthy, that, given the vast number of Establishment Clause cases to come before the Court, *not one Justice has ever suggested that the Pledge is unconstitutional*." Id. (Emphasis in original).

Judge Williams next rejected plaintiff's claim that recitation of the Pledge was coercive. The case law had applied that principle to religious exercises, but the Pledge "unlike prayer, is not a religious exercise or activity, but a patriotic one." Id., at *9. The Pledge did contain "a religious phrase," but inclusion of the words "under God" did not "alter the nature of the Pledge as a patriotic activity." Id., at *10. The Pledge is a "statement of loyalty to the flag of the United States, and the Republic for which its stands. . ." In contrast, a prayer was a communication

24

between an individual and a deity.  The coercion analysis used in cases such as <u>Lee</u>, <u>Schempp</u>, and <u>Engel</u> was not relevant to a case "challenging non-religious activities."  Even assuming that there was risk of indirect coercion, "the indirect coercion is not threatening to establish religion, but patriotism."   The notion "that official acknowledgments of religion and its role in the founding of our nation such as that in the Pledge 'pose a real danger of establishment of a state religion' is simply 'farfetched.'" <u>Id.</u>, (citation omitted).  The Pledge, "which is not a religious exercise . . . does not amount to an establishment of religion."  <u>Id.</u>

Similarly, in <u>Sherman v. Community Consol. Sch. Dist. No. 21</u>, 980 F.2d 437, 445- 448 (7th Cir. 1992), the Seventh Circuit rejected a challenge to a Illinois statute requiring recitation of the Pledge in its public elementary schools.  The inclusion of the words "under God" did not make the Pledge a "prayer"; Judge Easterbrook compared the Pledge to other "ceremonial references in civic life to a deity. . . ." <u>Id.</u>, at 445. The founders of the nation had established various traditions in which the deity was invoked; the <u>Engel</u> Court had "recognized this tradition and distinguished ceremonial references to God from supplications for divine assistance. . ." <u>Id.</u>, at 446.  In subsequent cases, the Court had similarly indicated that the Pledge of Allegiance was not an Establishment Clause problem.  <u>Id.</u>, at 447-48.  With the Supreme Court having "proclaim[ed] that a practice is consistent with the establishment clause," the court would "take its assurances seriously."  <u>Id.</u>, at 448.

These decisions and individual opinions make clear that the reference to God in the Pledge is not reasonably and objectively understood as endorsing or coercing individuals into silent assent to any particular religious doctrine.  That is, the Pledge is "consistent with the proposition that government may not communicate an endorsement of religious belief," <u>County</u>

25

of Allegheny, 492 U.S. at 602-603, because the reference to God acknowledges the undeniable historical facts that the Nation was founded by individuals who believed in God, that the Constitution's protection of individual rights and autonomy reflects those religious convictions, and that the Nation's "institutions presuppose a Supreme Being."  Zorach, 343 U.S. at 313.

Relying on a statement from one Congressional supporter of the 1954 amendment to the Pledge to include the phrase "under God," plaintiffs contend that the statute was passed "to ally God with this country against the threat of atheistic communism."  Pl. Br., at 12.[13]  But the 1954 amendment did not have the single-minded purpose of advancing religion that plaintiffs suggest. The Committee Reports viewed the amendment as a permissible acknowledgment that, "[f]rom the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God."  H.R. Rep. No. 1693, 1954 U.S.C.C.A.N. at 2340; see also S. Rep. No. 1287, 83d Cong., 2d Sess. 2 (1954) ("Our forefathers recognized and gave voice to the fundamental truth that a government deriving its powers from the consent of the governed must look to God for divine leadership"; and "Throughout our history, the statements of our great national leaders have been filled with

_____

[13] One of this past Term's Ten Commandments cases, McCreary County v. American Civil Liberties Union, __ U.S. __; 125 S.Ct. 2722 (2005), addressed the standard for determining whether a governmental purpose is unconstitutional.  McCreary reaffirmed that "a legislature's stated reasons will generally get deference" in "keeping with the respect owed in the first instance to such official claims," 125 S.Ct. at 2735-36, and that only a "sham" or implausible reason will violate the purpose prong.  Id.; see also Wallace v. Jaffree, 472 U.S. 38, 56 (1985) (law invalid "if it is entirely motivated by a purpose to advance religion") (cited in McCreary, 125 S.Ct. at 2736); Lynch, 465 U.S. at 680 (law invalid if "there [is] no question" that it is "motivated wholly by religious considerations") (cited in McCreary, 125 S.Ct. at 2736); United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926) (establishing general proposition that, "in the absence of clear evidence to the contrary, courts presume that [government officials] have properly discharged their official duties").

26

reference to God"); see also Elk Grove, 124 S.Ct. at 2306 (quoting above language from the

House Report).  Both Reports traced the numerous references to God in historical documents

central to the founding and preservation of the United States, from the Mayflower Compact to

the Declaration of Independence to President Lincoln's Gettysburg Address, with the latter

having employed the same reference to a "Nation[] under God."  H.R. Rep. No. 1693, 1954

U.S.C.C.A.N. at 2340-41; S. Rep. No. 1287, supra, at 2.

The Reports further identified a political purpose for the amendment — to highlight a

fundamental difference between the United States and Communist nations.  See H.R. Rep. No.

1693, 1954 U.S.C.C.A.N. at 2340 (noting that "Our American Government is founded on the

concept of the individuality and the dignity of the human being" and "[u]nderlying this concept is

the belief that the human person is important because he was created by God and endowed by

Him with certain inalienable rights which no civil authority may usurp"); see also S. Rep. No.

1287, supra, at 2.  Congress thus added "under God" to highlight the Framers' political

philosophy concerning the sovereignty of the individual, a philosophy with roots in religious

belief, to serve the political end of textually rejecting the "communis[t]" philosophy "with its

attendant subservience of the individual."  H.R. Rep. No. 1693, 1954 U.S.C.C.A.N. at 2340; see

also S. Rep. No. 1287, supra, at 2 ("The spiritual bankruptcy of the Communists is one of our

strongest weapons in the struggle for men's minds and this resolution gives us a new means of

using that weapon").

The House report also underscored the vital role the amended Pledge would play in

educating children about the fundamental values underlying the American system of government.

Through "daily recitation of the pledge in school," the "children of our land" will "be daily

impressed with a true understanding of our way of life and its origins," so that "[a]s they grow and advance in this understanding, they will assume the responsibilities of self-government equipped to carry on the traditions that have been given to us."  H.R. Rep. No. 1693, 1954 U.S.C.C.A.N. at 2341 (quotation and citation omitted).[14]

No doubt some Members of Congress may have been motivated, in part, to amend the Pledge because of their religious beliefs.[15]  As Justice O'Connor emphasized, however, such intentions would not undermine the constitutionality of the Pledge, because "those legislators also had permissible secular objectives in mind — they meant, for example, to acknowledge the religious origins of our Nation's belief in the 'individuality and dignity of the human being.'"  Elk Grove, 124 S.Ct. at 2325 (O'Connor, J., concurring) (citation omitted).  "Second -- and more critically – the subsequent social and cultural history of the Pledge shows that its original secular character was not transformed by its amendment."  Id.  (citation omitted).   "[W]hatever the sectarian ends [the] authors [of the 1954 amendment] may have had in mind, our continued repetition of the reference to 'one Nation under God' in an exclusively patriotic context has shaped the cultural significance of that phrase to conform to that context."  Id. (citation omitted).  More broadly, moreover, the Establishment Clause focuses on "the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law."  Board of Educ.

---

[14]  See 100 Cong. Rec. 1700 (1954)(Rep. Rabaut)("From their earliest childhood our children must know the real meaning of America.  Children and Americans of all ages must know that this is one Nation which 'under God' means 'liberty and justice for all.'").

[15]  It is wholly irrelevant, even if true,  that "the religious community" or the Knights of Columbus had some substantial role in supporting its enactment.  Pl. Br., at 5, 12.

v. Mergens, 496 U.S. 226, 249 (1990) (emphasis in original).[16]

This suit also challenges the Pledge as recently reenacted.  The purpose inquiry of the Lemon test should focus, therefore, on the federal government's modern-day purpose for retaining the Pledge intact).[17]  In McGowan, for example, the Supreme Court acknowledged that Sunday closing laws originally "were motivated by religious forces," 366 U.S. at 431, but nevertheless sustained those laws against an Establishment Clause challenge because modern-day retention of the laws advanced secular purposes.  Id., at 434.  To proscribe laws that advanced valid secular goals "solely" because they "had their genesis in religion," the Court reasoned, would "give a constitutional interpretation of hostility to the public welfare rather than one of mere separation of church and state."  Id., at 445; see also Freethought Soc'y v. Chester County, 334 F.3d 247, 261-62 (3d Cir. 2003).  The modern-day purposes of the federal Pledge statute are secular.  See Elk Grove, 124 S.Ct. at 2323 (O'Connor, J., concurring)(in the past fifty years, the Pledge has become "alongside the singing of the Star-Spangled Banner, our most routine ceremonial act of patriotism").

Finally, Habecker's claim that the Pledge statute violates his "free exercise" of religion is easily dismissed. Pl. Br., at p.10.  The Free Exercise Clause "affords an individual protection from certain forms of governmental compulsion. . . ."  Bowen v. Roy, 476 U.S. 693, 700 (1986)

---

[16]  See also McGowan v. Maryland, 366 U.S. 420, 469 (1961) (opinion of Frankfurter, J.); United States v. O'Brien, 391 U.S. 367, 384 (1968)("[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it. . . .").

[17]  The contemporary federal government's purpose for retaining the Pledge, including its reference to God, advances the legitimate, secular purpose of "acknowledgment of the religious heritage of the United States."  H.R. Rep. No. 659, 107th Cong., 2d Sess. 4 (2002), reprinted in 2002 U.S.C.C.A.N. 1304.

(emphasis added); <u>accord</u> <u>Grove v. Mead Sch. Dist. No. 354</u>, 753 F.2d 1528, 1533 (9th Cir.) ("[t]he free exercise clause recognizes the right of every person to choose among types of religious training and observance, free of state compulsion"), <u>cert.</u> <u>denied</u>, 474 U.S. 826 (1985). The Pledge statute, as explained <u>supra</u> does not, on its face or otherwise, compel anyone to engage or not engage in any activity; nor does it prohibit anyone from engaging or not engaging in any activity.  The statute merely sets forth the words of the Pledge and provides the manner of addressing the Flag when the Pledge is recited.  4 U.S.C. § 4 thus does not implicate the Free Exercise Clause.  For all of these reasons, plaintiffs' claims challenging 4 U.S.C. § 4 should be dismissed.

## III.    THE TOWN'S PLEDGE PRACTICE IS CONSTITUTIONAL

In addition to challenging 4 U.S.C. § 4 on its face, plaintiffs contend the Pledge is unconstitutional as applied to the voluntary recitation of the Pledge by the Board of Trustees at their meetings.   None of these arguments has merit.

In determining whether recitation of the Pledge at Trustee meetings comports with the Establishment Clause, the question is "whether the government acted with the purpose of advancing or inhibiting religion" and whether recitation of the Pledge has the "'effect' of advancing or inhibiting religion." <u>Agostini v. Felton</u>, 521 U.S. 203, 222-223 (1997); <u>see</u> <u>also</u> <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 306-308 (2000).  As we now show, recitation of the Pledge at those meetings has no such impermissible purpose or effect.

### A.    The Purpose Of Reciting The Pledge Is To Promote Patriotism And National Unity

A statute or rule runs afoul of the Establishment Clause's purpose inquiry only if it is

"entirely motivated by a purpose to advance religion." Wallace, 472 U.S. at 56; see also Lynch, 465 U.S. at 680 (law invalid if "there [is] no question" that it is "motivated wholly by religious considerations").  The Town Trustees' practice of voluntary recitation of the Pledge is for the purpose of promoting patriotism, not advancing religion.

The Supreme Court expressly has recognized that the recitation of the Pledge is a "patriotic exercise" designed to "foster national unity and pride in those principles [our flag symbolizes]." Elk Grove, 124 S.Ct. at 2305; see also id. at 2317 (Rehnquist, C.J., concurring) ("the Pledge itself is a patriotic observance focused primarily on the flag and the Nation, and only secondarily on the description of the Nation"); Myers, 251 F.Supp.2d 1262, 1269 (E.D. Va. 2003) (statute providing for recitation by schoolchildren of Pledge has a secular purpose), aff'd, __ F.3d ___; 2005 WL 1879911 (4th Cir. Aug. 10, 2005).  The Town's Pledge practice is fully consistent with that principle.

**B.     The Pledge Has The Valid Secular Effect Of Promoting Patriotism And National Unity**

The Town's Pledge practice, which involves the voluntary recitation of the Pledge at Trustee meetings, serves the secular values of promoting national unity, patriotism, and an appreciation for the values that define the Nation.  Plaintiffs do not seem to quarrel with the general proposition that the government can foster patriotism.  See Pl. Br., at 9; see also West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 640 (1943) ("[n]ational unity as an end which officials may foster by persuasion and example is not in question"); Sherman, 980 F.2d at 444 ("Patriotism is an effort by the state to promote its own survival, and along the way teach those virtues that *justify* its survival.  Public schools help to transmit those virtues and values.")

(emphasis in original).  There can be no question, moreover, that recitation of the Pledge "is a patriotic exercise" designed to "foster national unity and pride" in the principles our flag symbolizes.  Elk Grove, 124 S.Ct. at 2305.[18]

In analyzing whether recitation of the Pledge by the Town Trustees has the effect of endorsing religion, the "relevant question[]" is "'whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer'" or religion.  Santa Fe, 530 U.S. at 308 (citation omitted); see also Elk Grove, 124 S.Ct. at 2322-23 (O'Connor, J., concurring).  There is no reasonable basis for perceiving such religious endorsement in the Pledge's recitation.  Contrary to plaintiffs' suggestion, see, e.g., Pl. Br, at 6, 12, the Pledge is not a profession of a religious belief, but a statement of allegiance and loyalty to the Republic itself.  By common understanding, a "pledge" of "allegiance" is a "promise or agreement" of "loyalty of a citizen to his or her government." The Random House Dictionary of the English Language 55, 1486 (2d ed. 1987).  Plaintiffs' contention that the Pledge somehow is transformed into an unconstitutional endorsement of religion by virtue of its inclusion of the words "under God" is wrong in three fundamental respects.

### 1.     *The Pledge must be considered as a whole*

Plaintiffs err, initially, in divorcing the phrase "under God" from its larger context.  In

---

[18] Citing Justice Breyer's opinion in Van Orden v. ACLU, ___U.S. ___; 125 S.Ct. 2854, 2869 (2005)("Van Orden"), Habecker asserts that Justice Breyer has abandoned the Lemon test, in favor of a "fact-intensive" analysis that will "focus more on context and use," and that "his reasoning now controls" the adjudication of Establishment Clause cases.  Pl. Br., at 12.  That opinion, however, does not announce any such broad-ranging principle for resolution of such future cases.

Lynch, the Supreme Court emphasized that Establishment Clause analysis looks at religious symbols and references in their broader setting, rather than "focusing almost exclusively on the" religious symbol alone.  465 U.S. at 680.  In Lynch, the Court did not ask whether the government's display of a creche — a clearly sectarian symbol — was permissible.  Rather, the Court analyzed whether the overall message conveyed by a display that included both religious and other secular symbols of the holiday season conveyed a message of endorsement, and concluded that it did not.  Id., 465 U.S. at 680-686.

Likewise, in County of Allegheny, the Supreme Court analyzed and upheld the "combined display" during the winter holiday season of a Christmas tree, Liberty sign, and Menorah.  492 U.S. at 616.  The Court looked at the content of the display as a whole, rather than focusing on the presence of the Menorah and the religious message that the Menorah would convey in isolation.  Id., 492 U.S. at 620-21.  The Court did this even though the city government had added the Menorah, after the fact, to a preexisting holiday display.  Id., 492 U.S. at 581-582.

Read as a whole, the Pledge is much more than an isolated reference to God.  Congress did not enact a pledge to a religious symbol, a pledge to God, or a pledge of "belief in God"; individuals pledge allegiance to "the Flag of the United States of America," and "to the Republic for which it stands."  4 U.S.C. § 4.  See Elk Grove, 124 S. Ct. at 2319, 2320 (Rehnquist, C.J., concurring) ("participants promise fidelity to our flag and our Nation, not to any particular God, faith, or church") (footnote omitted).  The remainder of the Pledge is descriptive — delineating the culture and character of the Republic as a unified Country, composed of individual States yet indivisible as a Nation, established for the purposes of promoting liberty and justice for all, *and* founded by individuals whose belief in God gave rise to the governmental institutions and

33

political order they adopted. The reference to a "Nation under God" is a statement about the Nation's historical origins, its enduring political philosophy centered on the sovereignty of the individual, and its continuing demographic character — a statement that itself is simply one component of a larger, more comprehensive patriotic message.

### 2. *Reciting the Pledge is not a religious exercise*

As explained <u>supra</u> Part III, the decisions of the Supreme Court and opinions of individual Justices repeatedly affirm that not every reference to God amounts to an impermissible government-endorsed religious exercise, and they expressly refer to the Pledge and similar ceremonial references in contradistinction to formal religious exercises like prayer and Bible reading. <u>See</u>, <u>e.g.</u>, <u>Elk Grove</u>, 124 S. Ct. at 2324, 2325 (O'Connor, J., concurring) (unlike "actual worship or prayer," "I know of no religion that incorporates the Pledge into its canon, nor one that would count the Pledge as a meaningful expression of religious faith"); <u>id.</u> at 2319-20 (Rehnquist, C.J., concurring) ("[t]he phrase 'under God' is in no sense a prayer, nor an endorsement of any religion").

In <u>Engel v. Vitale</u>, for example, the Supreme Court struck down the New York public school system's practice of reciting a nondenominational Regents prayer because that formal "invocation of God's blessings" was a religious activity, "a solemn avowal of divine faith and supplication for the blessings of the Almighty." 370 U.S. at 424. The Court contrasted the Regents prayer with the "recit[ation] [of] historical documents such as the Declaration of Independence which contain references to the Deity," concluding that "[s]uch patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored[.]" <u>Id.</u>, 370 U.S. at 435 n.21. While the official prayer

transgressed the boundary between church and state, no Justice questioned New York's practice of preceding the prayer with the recitation of the Pledge.  See id., 370 U.S. at 438, 440 n.5 (Douglas, J., concurring).

Likewise, in the course of striking down school prayer in Schempp, the Court noted, without concern, that the students also recited the Pledge of Allegiance immediately after the invalidated prayer.  Schempp, 374 U.S. at 208.  That is because, as the concurrence explained, "daily recitation of the Pledge of Allegiance . . . serve[s] the solely secular purposes of the devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government." 374 U.S. at 281 (Brennan, J., concurring).  "The reference to divinity in the revised pledge of allegiance," the concurrence continued, "may merely recognize the historical fact that our Nation was believed to have been founded 'under God.'"  374 U.S. at 304.  Its recitation may be "no more of a religious exercise than the reading aloud of Lincoln's Gettysburg Address, which contains an allusion to the same historical fact."  Id.; see also Lee, 505 U.S. at 583 (striking down graduation prayer, without suggesting that the Pledge, which preceded the Prayer, was improper).

As these cases recognize, describing the Republic as a Nation "under God" is not the functional equivalent of prayer, or any other performative religious act.  No communication with or call upon the Divine is attempted.  The phrase is neither addressed to God nor a call for His presence, guidance, or intervention.  See Elk Grove, 124 S.Ct. at 2320 (Rehnquist, C.J., concurring).  Nor can it plausibly be argued that reciting the Pledge is comparable to reading sacred text, like the Bible, or engaging in an act of religious worship.  The phrase "Nation under God" simply has no established religious usage as a matter of history, culture, or practice.

It is true that the Pledge is a "declar[ation] [of] a belief."  Barnette, 319 U.S. at 631.  But contrary to plaintiffs' suggestion, Pl. Br., at 12, the belief declared is not a belief in God or monotheism; it is a belief in allegiance and loyalty to the United States Flag and the Republic that it represents.  See Elk Grove, 124 S.Ct. at 2319-20 (Rehnquist, C.J., concurring).  That is a *politically* performative statement, not a religious one.[19]  A reasonable observer, reading the text of the Pledge as a whole, cognizant of its purpose, and familiar with (even if not personally subscribing to) the Nation's religious heritage, would understand that the reference to God is not an approbation of monotheism, but a patriotic and unifying acknowledgment of the role of religious faith in forming and defining the unique political and social character of the Nation.  See Elk Grove, 124 S.Ct. at 2305 ("recitation [of the Pledge] is a patriotic exercise designed to foster national unity and pride in th[e] principles [our Flag symbolizes]").  Reciting the Pledge at the Board of Trustees meetings is consistent with these principles.[20]

Beyond that, the Pledge is indistinguishable from other permissible acknowledgments of religion in public life.  There simply is no coherent or discernible difference between inviting adults or schoolchildren to say the Pledge and inviting them to, for example, sing the "officially espoused" National Anthem ("And this be *our* motto 'In God is *our* Trust'") (emphasis added),

---

[19]   See Myers, 251 F.Supp.2d at 1269 ("the practical message of the pledge is that the speaker supports the political ideologies on which this country is founded").

[20]   In addition, several courts, including this Circuit, have upheld nonsectarian prayer by local legislators.  Snyder v. Murray City Corporation, 159 F.3d 1227, 1234  (10th Cir. 1998)(en banc)("We are obliged, therefore, to read Marsh [v. Chambers, 463 U.S. 783 (1983)] as establishing the constitutional principle that the genre of government religious activity that has come down to us over 200 years of history and which we now call 'legislative prayer' does not violate the Establishment Clause."); Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276, 282-84 (4th Cir. 2005)("non-sectarian legislative prayer generally does not violate the Establishment Clause").

36

Engel, 370 U.S. at 435 n.21, 440 n.5,  or recite the National Motto ("In God *we trust*"), 36 U.S.C. § 302 (emphasis added), the Declaration of Independence, 1 U.S.C. at XLIII ("*We* hold these truths to be self evident, that all men . . . are endowed by their Creator with certain unalienable Rights") (emphasis added), or the Gettysburg Address.[21]

### 3.   *The Town' Pledge-recital practice is not coercive*

Plaintiffs assert that the Town's Pledge practice is unconstitutionally coercive, citing the Supreme Court's decisions in Lee v. Weisman, 505 U.S. 577 (1992), and West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624 (1943).  Pl. Br., at 7-10.  Barnette, however, establishes the relevant standard for analyzing whether a specific Pledge practice safeguards the constitutional rights of individuals who wish to "opt-out," and Lee is readily distinguishable on its facts.

Barnette involved a challenge by Jehovah's Witnesses to a board of education policy that compelled public school students to salute the flag and recite the pre-1954 version of the Pledge (i.e., the version of the Pledge without "under God"), with no opportunity to opt out from the recital.  See 319 U.S. at 629 ("[f]ailure to conform is 'insubordination' dealt with by expulsion").  The Jehovah's Witnesses claimed the Pledge ceremony violated their religious beliefs by forcing them to salute a "graven image."  Id.  The Court agreed, and held the Jehovah's Witnesses could not be compelled to salute the flag and recite the Pledge:  "no official, high or petty, can prescribe

---

[21] Although Habecker cites Van Orden v. Perry in support of his claim that the recitation of the Pledge by the Trustees has engendered divisiveness and controversy, Pl., Br., at 11, the Supreme Court generally has inquired  into "political divisiveness" in cases involving direct aid to church-sponsored schools or colleges, Lynch v. Donnelly, 465 U.S. at 684.  Cf. Zelman v. Simmons-Harris, 536 U.S. 639, 662 n.7 (2003)(noting rejection of the "divisiveness" factor in more recent challenges to recent aid programs).  Moreover, "[a] litigant cannot, by the very act of commencing a lawsuit . . . create the appearance of divisiveness and then exploit it as evidence of entanglement."  Lynch, at 684-85. In Agostini, the Court held that political divisiveness alone does not invalid government action under the Establishment Clause.  521 U.S. at 233-34.

what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id., 319 U.S. at 642.

Barnette thus makes clear, with specific reference to the Pledge, that it is only compelled recitation of the Pledge without the possibility of opting out, the coerced "confess[ion] by word or act" (319 U.S. at 642), that transgresses constitutional bounds.[22] Mere exposure to other individuals reciting the Pledge does not rise to the level of constitutionally proscribed coercion. Indeed, the Elk Grove majority recognized this point, stating:  "The Elk Grove Unified School District has implemented the state law by requiring that "[e]ach elementary school class recite the pledge of allegiance to the flag once each day.  *Consistent with our case law*, the School District permits students who object on religious grounds to abstain from the recitation." 124 S.Ct. at 2306 (citing Barnette) (footnote omitted) (alteration in original) (emphasis added).  Barnette, therefore, is dispositive with respect to plaintiffs' "coercion" claim.[23]

Plaintiffs contend that the Town's Pledge practice violates the coercion principles applied in Lee v. Weisman.  Even if Lee, and not Barnette, is the relevant touchstone, plaintiffs' argument

---

[22] Consistent with that understanding, by law, Colorado school districts "shall provide an opportunity each school day for willing students to recite the pledge of allegiance in public elementary and secondary educational institutions. Any person not wishing to participate in the recitation of the pledge of allegiance shall be exempt from reciting the pledge of allegiance and need not participate."  COLO. REV. STAT. ANN. §  22-1-106(3) (2004).

[23] Although the claim in Barnette was discussed in free speech terms, the Jehovah's Witnesses' objection to reciting the Pledge was grounded in their religious views.  See Barnette, 319 U.S. at 629, 633 & n.13.  Thus, while plaintiffs' claims arise under the Establishment Clause, Barnette provides the controlling standard.  See Elk Grove, 124 S.Ct. at 2306 (citing Barnette).  Indeed, the government would have no greater right to "coerce" political orthodoxy (the issue in Barnette) than it would to "coerce" religious orthodoxy (the issue here).  See Barnette, 319 U.S. at 642 ("no official, high or petty, can prescribe what shall be orthodox in *politics*, nationalism, *religion*, or other matters of opinion or force citizens to confess by word or act their faith therein") (emphasis added).

38

fails because reciting the Pledge is not a religious exercise.  As we explain below, the test for unconstitutional coercion under Lee is simply whether the government  has become pervasively involved in or effectively coerced a religious exercise.

In Lee, the Supreme Court held that the Establishment Clause proscribed prayers at a public secondary school graduation ceremony.  See 505 U.S. at 599.  What made those prayers unconstitutionally coercive, however, was their character as a pure "religious exercise" and the government's "pervasive" involvement in institutionalizing the prayer, to the point of making it a "state-sponsored and state-directed religious exercise."  Id., 505 U.S. at 587.  Coercion thus arose because (1) the exercise was so profoundly religious that even quiet acquiescence in the practice would exact a toll on conscience; see id., 505 U.S. at 588 ("the student had no real alternative which would have allowed her to avoid the fact or appearance of participation"); and (2) the force with which the government endorsed the religious exercise sent a signal that dissent would put the individual at odds not just with peers, but with school officials as well.  See id., 505 U.S. at 592-594.

Habecker's situation is in no way comparable to the students in Lee.  First, and most fundamentally, the Pledge is not a prayer.  Reciting the Pledge or listening to others recite it is a patriotic exercise.[24]  Myers, 251 F.Supp.2d 1272 (distinguishing prayer at issue in Lee from "the

---

[24] Elk Grove, 124 S.Ct. at 2305 (recitation of the Pledge "is a patriotic exercise designed to foster national unity and pride in those principles").  The Pledge is not a religious exercise at all, let alone a core component of worship like prayer.  See Elk Grove, 124 S.Ct. at 2319-20 & n.4 (Rehnquist, C.J., concurring) (phrase "under God" in the Pledge does not "convert[] its recital into a 'religious exercise' of the sort described in Lee"); id. at 2327 (O'Connor, J., concurring) ("[a]ny coercion that persuades an onlooker to participate in an act of ceremonial deism is inconsequential, as an Establishment Clause matter, because such acts are simply not religious in character").

pledge of allegiance, which this Court holds is a secular statement and not a religious prayer").

Second, the Town Trustees did nothing more than begin reciting the Pledge at the beginning of

their meetings.  The most distinguishing feature of <u>Lee</u>, however, is the fact that Habecker is a

mature adult, not a school-aged student.[25]  No superior official forced Habecker to say the

Pledge, nor did Town officials discipline Habecker for abstaining from its recitation.[26]  In fact, at

the May, 2004 meeting, Habecker recited the Pledge in part, omitting "under God" during his

recitation.[27]  <u>See</u> <u>Elkgrove</u>, 124 S.Ct., at 2326)(O'Connor, J., concurring)("[the 'under God']

reference makes it easier for those participants who wish to 'opt out' of language they find

offensive to do so without having to reject the ceremony entirely").   In any event, Habecker's

discomfort is simply not a cognizable claim.  Pl. Br., at 7.  The government does not make

"religion relevant to standing in the political community simply because a particular viewer of a

---

[25]  <u>Lee</u> at 587 ("conducting this formal religious observance conflicts with settled rules
pertaining to prayer exercises for students"), <u>id.</u>, at 590 (the prayer "put school-age children who
objected in an untenable position");  <u>id.</u>, at 593 ("We do not address whether that choice is
acceptable if the affected citizens are mature adults. . .").  Another case cited by Habecker, <u>Santa
Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290 (2000), is similarly distinguishable insofar as it
involved prayer at high school football games.

[26] Although Habecker asserts that he could not have absented himself from the room
while the Pledge was being recited, Pl. Br., at 7, he has failed to identify any obstacle to his doing
so.  <u>See</u> <u>Tanford v. Brand</u>, 104 F.3d 982, 985 (7th Cir.) (some students at a voluntary college
commencement ceremony "left during the invocation, then returned and exited before
benediction"), <u>cert. denied</u>, 522 U.S. 814 (1997); <u>Elkgrove</u>, 124 S. Ct., at 2326 (O'Connor, J.,
concurring)("students who wish to avoid saying the words 'under God' still can consider
themselves meaningful participants in the exercise if they join in reciting the remainder of the
Pledge.").  Habecker tries to distinguish <u>Marsh v. Chambers</u>  by asserting that any Nebraska
legislators who objected to the chaplain's prayer could simply sit "passively, albeit solemnly"
during the prayer, and were not subjected to any penalties for their conduct.  Pl. Br., at 8.  But the
Town Trustees did not force Habecker to utter the Pledge, and it was the independent action of
the voters that effected Habecker's recall.

[27]  See Habecker Deposition, p. 14, lines 15-23; p. 74, lines 2-10.

40

display might feel uncomfortable." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring); see Chaudhuri v. Tennessee, 130 F.3d 232, 239 (6th Cir. 1997), cert. denied, 523 U.S. 1024 (1998)(even if college faculty member would have been obliged to attend university functions at which prayers were uttered, no "coercion" would have resulted).[28]

Any analysis of the coercive effect of voluntary recital of the Pledge must also take into account the Supreme Court's repeated assurances that the "many manifestations in our public life of belief in God," Engel, 370 U.S. at 435 n.21, far from violating the Constitution, are permissible, including in public school classrooms. See id. In particular, over the last half century, the text of the Pledge of Allegiance, with its reference to God, has become part of our national culture. See Elk Grove, 124 S. Ct. at 2323 (O'Connor, J., concurring) (noting that in the fifty years that have passed since Congress added the words "under God" to the Pledge, "the Pledge has become, alongside the singing of the Star-Spangled Banner, our most routine ceremonial act of patriotism"). Public familiarity with the Pledge's use as a patriotic exercise and a solemnizing ceremony for public events ensures that the reasonable observer,

---

[28] See also Capitol Square, 515 U.S. at 779 (O'Connor, J., concurring) (noting that the endorsement inquiry "is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of a faith to which they do not subscribe"; otherwise, the Establishment Clause would "'entirely sweep[] away all government recognition and acknowledgment of religion in the lives of our citizens'") and other similar ceremonial references to God). Thus, whatever "incidental" benefit might befall religion from the government's acknowledgment of the Nation's religious heritage does not implicate the Establishment Clause. Pinette, 515 U.S. at 768 (Opinion of Scalia, J.). Put another way, the Establishment Clause is not violated just because a governmental practice "happens to coincide or harmonize with the tenets of some or all religions." McGowan, 366 U.S. at 442; see also Lynch, 465 U.S. at 683.

41

familiar with the context and historic use of the Pledge, will not perceive governmental

endorsement of religion at the mere utterance of the phrase "under God" in that recitation.

Recitation of the Pledge at Town meetings thus comports with the Establishment Clause.

C.   **Recitation of the Pledge of Allegiance Does Not Constitute A "Religious Test for Public Office" in Violation of Article VI of the United States Constitution**.

Habecker argues that the Pledge of Allegiance "requires the recitation of an oath to God,"

and that its recitation, under the circumstances of his specific case, was a "religious test" in

violation of Article VI of the Constitution.[29]  Pl. Br., at 14.  Habecker argues that his failure to

recite the Pledge "was the reason, the sole reason," for his recall.  Id.  This challenge, of course,

is not to the Pledge of Allegiance statute on its face, but appears to be an "as applied" challenge

to the Town's recitation practice, or, more directly, to the recall election.[30]  In any event, no

matter how that argument is framed, this claim is without merit.[31]

_____

[29] Article VI provides, in pertinent part:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

U.S. Const. art. VI, cl. 3.

[30] Plaintiffs' brief is inconsistent with the Amended Complaint.  The complaint challenges the recall election as being in violation of Article VI and the First Amendment and the Pledge of Allegiance as being in violation of the First Amendment.  See Amd. Compl., ¶¶ 30-31, Request for Relief, ¶¶ D, ¶¶ 28-29, Request for Relief, ¶ A.

[31] Plaintiffs note that the Supreme Court has not decided if Article VI is enforceable as to state officials, citing Torcaso v. Watkins, 367 U.S. 488, 489 n.1 (1961).  Given the lack of merit to Habecker's claims under the Establishment Clause and Free Exercise Clause, this Court also

First, the "religious test clause" prohibitions are essentially subsumed into the First Amendment religion clauses.  Laurence H. Tribe, *American Constitutional Law* § 14-2 at 1155 n.1 (2d ed. 1988) ("As a practical matter, the [Establishment and Free Exercise] [C]lauses are dispositive in cases challenging alleged "religious tests"; hence the religious test clause is now of little independent significance.").  Thus, because the Town's Pledge practice does not violate the Establishment Clause or the Free Exercise Clause, it does not run afoul of the narrower religious test clause.  See  Anderson v. Laird, 316 F. Supp. 1081, 1093 (D.D.C. 1970) ("The Court having determined that there is no violation of the Establishment Clause in the mandatory attendance [by service academy cadets at chapel services], it necessarily follows that there can be no violation of the test oath prohibition."), rev'd on other grounds, 466 F.2d 283 (D.C. Cir. 1972).

Second, even if the Court concludes that the religious test clause of Article VI prohibits some government actions that would not be prohibited by the Establishment or Free Exercise Clauses, plaintiff's religious test oath claim would still fail, as there is simply no religious test oath in either the text or actual recitation of the Pledge of Allegiance.  As explained above, the Pledge is not a religious "prayer" or an oath to God, but instead is a "patriotic exercise." Elkgrove, 124 S.Ct., at 2305; id. at 2317, 2319-20 (Rehnquist, C.J., concurring); id. at 2323 (O'Connor, J., concurring).  Recitation is voluntary; Habecker has failed to show that Town officials forced him to recite the Pledge, and he certainly cannot contend that Town law made recitation of the Pledge a qualification for holding public office.

This case is wholly unlike  Torcaso v. Watkins, 367 U.S. 488, 489 (1961), in which the Supreme Court invalidated a provision of the Maryland Constitution that imposed a "religious

need not decide that issue.

test" for public office – that the individual make "a declaration of belief in the existence of God. . . ." Id., at 489-90.  There could be "no dispute" that the provision created an explicit religious test, but the Court found it squarely inconsistent with the First Amendment.  Id., at 491-94. The Court reaffirmed that "neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.'  Neither can constitutionally pass laws or impose requirements which aid all religions as against nonbelievers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." Id., at 495 (footnotes and citations omitted).  The Maryland "religious test for public office unconstitutionally invades [Torcaso's] freedom of belief and religion and therefore cannot be enforced against him."  Id., at 496.

In contrast to Torcaso, which involved "state-imposed criteria forbidden by the Constitution," 367 U.S. at 496, Habecker cannot point to any oath or similar written qualification for the basis of his challenge.  He acknowledges that the only oath he took when he was sworn into office was to support the United States Constitution, the Colorado Constitution, and the Ordinances of the Town.  Pl. Br., at 16.  The Trustees' recitation of the Pledge cannot be equated with such an oath.[32]

---

[32] As noted supra, Habecker's complaint in this respect is directed at the independent action of the voters who recalled Habecker from office.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should reject plaintiffs' challenge to the constitutionality of the Pledge of Allegiance and to the Town's practice of reciting the Pledge at its Board of Trustee meetings.

Dated: September 12, 2005                    Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

FELIX V. BAXTER
Branch Director

WILLIAM J. LEONE
United States Attorney

KEVIN TRASKOS
Assistant United States Attorney


<u>s/ Theodore C. Hirt    </u>
THEODORE C. HIRT
(D.C. Bar 242982)
Assistant Director
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. #7106
P.O. Box 883
Washington, D.C. 20530
Telephone:  (202) 514-4786
E-mail: theodore.hirt@usdoj.gov
Fax:  (202) 616-8470

Attorneys for the United States of America